**MERCK & CO., INC., Appellant,**

v.

**Carol A. ERNST, Individually and as Personal Representative of the Estate of Robert Charles Ernst, Deceased, Appellee.**

No. 14–06–00835–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 4, 2009.

Rehearing En Banc Overruled
Nov. 19, 2009.

---

Katherine D. Mackillop, Houston, TX, for appellants.

W. Mark Lanier and David W. Holman, Houston, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and BROWN.

## SUBSTITUTE OPINION

ADELE HEDGES, Chief Justice.

Appellee's motion for rehearing en banc is denied as moot. The opinion of May 29, 2008, is withdrawn and the following is substituted therefor.

Merck & Co., Inc. ("Merck"), appeals from a jury verdict in a personal-injury and wrongful-death suit filed by Carol Ernst in which she alleged that ingestion of Vioxx caused the sudden cardiac death of her husband, Bob Ernst. Merck raises four issues in which it challenges the legal and factual sufficiency of the evidence to support the jury's verdict on causation, strict liability, negligence, malice, and damages. Merck further contends that the trial court erred in instructing the jury and in admitting certain evidence. Finding the evidence to be legally insufficient on the issue of causation, we reverse the trial court's judgment and render judgment that appellee take nothing.

### I. BACKGROUND

Vioxx, known generically as rofecoxib, belongs to a general class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs"). NSAIDs work by in-

hibiting cyclooxygenase ("COX"), an enzyme that stimulates synthesis of prostaglandins, which are chemicals produced in the body that promote certain effects. Traditional NSAIDs, such as Advil (ibuprofen), Aleve (naproxen), and Voltaren (diclofenac), have been longstanding treatment options for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis, rheumatoid arthritis, and other musculoskeletal conditions. This relief, however, has historically come with significant adverse side effects. Specifically, traditional, NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs"). This risk is further increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain.

In the early 1990s, scientists discovered that the COX enzyme had two forms—COX–1 and COX–2—each of which appeared to have several distinct functions. Scientists believed that COX–1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining, whereas COX–2 mediated the synthesis or production of prostaglandins responsible for pain and inflammation. This belief led scientists to hypothesize that "selective" NSAIDs designed to inhibit COX–2, but not COX–1, could offer the same pain relief as non-selective NSAIDs with a reduced risk of fatal or debilitating PUBs. In addition, scientists believed that such drugs might also prove beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers where evidence suggests that inflammation may play a causative role. In light of these scientific developments, pharmaceutical companies began developing new drugs known as "COX–2 inhibitors" or "coxibs." Merck developed a COX–2 inhibitor and named it Vioxx.

## A. Development and Marketing of Vioxx

On November 23, 1998, Merck submitted a new drug application for Vioxx to the Food and Drug Administration ("FDA") and requested an expedited review of its application. Six months later, on May 20, 1999, the FDA approved Vioxx as safe and effective for treatment of osteoarthritic pain, menstrual pain, and acute pain based on the data and label supplied by Merck.

### 1. Clinical Trials

Vioxx was subjected to a number of studies and tests both before and after its initial approval. Dr. Nancy Santanello is a physician researcher and the executive director of the epidemiology group at Merck Research Labs ("MRL"), a division of Merck that researches and develops new medications. She supervised the clinical trials and epidemiology studies of Vioxx until it was removed from the market in September 2004. Dr. Santanello testified that in developing a new drug, Merck conducts three phases of clinical trials. In Phase One, the drug is tested on healthy individuals to determine how well it is absorbed and tolerated. In Phase Two, the drug is tested on individuals who have the disease that the drug is designed to prevent or treat; in the case of Vioxx, it was tested on patients with osteoarthritis. In Phase Three, large clinical trials are conducted to test the safety of the drug. The FDA requires at least two trials with consistent results in Phase Three before it will approve a new drug. There were 54 clinical trials conducted for Vioxx prior to its approval by the FDA. These clinical trials showed no statistically significant difference in cardiovascular events between Vioxx and a placebo, or between Vioxx and traditional NSAIDs.

Dr. Santanello testified that Dr. Garret Fitzgerald, a researcher at MRL, conducted Phase One research into the renal effects of Vioxx. In measuring urinary output of patients taking Vioxx, Dr. Fitzgerald found a decrease in prostaglandin metabolites, indicating the possibility of an imbalance of prostacyclin and thromboxane. Dr. Fitzgerald theorized that Vioxx creates an imbalance between thromboxane and prostacyclin in the blood vessels. Thromboxane promotes platelet aggregation, vessel constriction, and proliferation of smooth muscle cells. Prostacyclin, by contrast, opposes the action of thromboxane inhibiting platelet aggregation, facilitating vasodilation, and preventing proliferation of smooth muscle cells. In blocking COX–2, Vioxx also blocks prostacyclin; therefore, Dr. Fitzgerald hypothesized, the inhibition of COX–2 promotes an imbalance of prostacyclin and thromboxane in the blood vessels, leading to the formation of blood clots. In 1998, Merck made the FDA advisory board aware of the Fitzgerald hypothesis. The FDA concluded that while the hypothesis was a theoretical concern, there was no evidence that it was true.

Dr. Santanello also testified that Merck recognized the concerns raised by the Fitzgerald hypothesis and conducted several studies designed to determine whether Vioxx had a biochemical effect on the cardiovascular system. As a result of Dr. Fitzgerald's hypothesis, Merck created a "Standard Operating Procedure for the Surveillance Monitoring and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX–2 Specific Inhibitors." As part of the standard operating procedure, Merck assembled groups of independent physicians with expertise in thromboembolic events to monitor their clinical trials to determine whether patients taking Vioxx experienced an increase in those events. Dr. Santanello testified that even after the FDA had approved Vioxx for treatment of osteoarthritis, acute pain and menstrual pain, Merck continued to study Vioxx for the treatment of other conditions.

## 2. VIGOR Trial

In March of 2000, Merck received the preliminary results of the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study. VIGOR was an 8,000–patient trial designed to assess the relative incidence of gastrointestinal PUBs in rheumatoid arthritis patients treated with Vioxx as compared to those treated with the drug naproxen. The VIGOR trial was conducted with a 50–milligram dose of Vioxx, twice the approved dosage for osteoarthritis. The results of the VIGOR trial revealed that, after nine months of daily 50–milligram doses, of the 4,000 patients taking Vioxx, 20 had suffered a thromboembolic event; of the 4,000 patients taking Naproxen, four had suffered a thromboembolic event. Merck did not immediately remove Vioxx from the market after receiving these results because it was unclear whether Vioxx lead to the thromboembolic events, or whether Naproxen had helped prevent such events. While VIGOR demonstrated that patients taking Vioxx suffered fewer serious gastrointestinal PUBs than patients taking Naproxen, it also showed that patients on Vioxx suffered a statistically significant increase of serious cardiovascular thrombotic events [1] compared to patients taking Naproxen.

1. "Cardiovascular thrombotic events" are events such as strokes and myocardial infarc- tions caused by blood clots.

### 3. Additional Clinical Trials

At the time of the VIGOR trial, two studies were simultaneously conducted on Alzheimer's patients to determine if Vioxx could treat the inflammation associated with Alzheimer's disease. Those studies differed from the VIGOR trial in that the control group was taking a placebo, not Naproxen. In those studies, half the patients took 25 milligrams of Vioxx, and the other half took a placebo. The results of those studies showed that fewer thromboembolic events had occurred in the patients taking Vioxx than in those taking a placebo. As a result of those studies, Merck determined that the VIGOR results were caused by Naproxen's alleged cardioprotective effect. In a press release dated March 27, 2000, Merck released the results of the VIGOR study stating that patients on Vioxx had a lower incidence of serious gastrointestinal events and that patients on Naproxen had a lower incidence of serious thromboembolic events. The press release explained the higher incidence of thromboembolic events was due to Naproxen's cardioprotective effect.

### 4. Merck's Marketing and Distribution of Vioxx

David Anstice is president of Merck's Human Health Division for Canada, Latin America, Japan, Australia, and New Zealand. Until December 2002, he was president of the Human Health Division for the Americas. In that position, he was responsible for sales and marketing activities. He testified that in the late 1990's, sales of Pepcid were a significant source of revenue for Merck. The patent was due to expire in either 2000 or 2001, and Merck was looking to drugs like Vioxx to maintain that level of revenue. Merck engaged in what Anstice described as a "race" with Searle Pharmaceuticals,[2] later Pfizer

Searle, to put a COX–2 inhibitor on the market. In marketing Vioxx, Merck decided to distribute more free samples of Vioxx than they had distributed for any previous drugs. In one year, Merck spent over $300 million to market Vioxx. In 2002, Merck sold two and a half billion dollars worth of Vioxx, its second best selling drug.

Ernst introduced into evidence an email sent from a stock analyst in which Merck's Vioxx studies were analyzed. The analyst stated that in looking specifically at arthritis patients, the analysis revealed that Vioxx-treated patients experienced a higher incidence of cardiovascular events compared to patients given a placebo in both rheumatoid arthritis and osteoarthritis studies. The analyst further expressed suspicion of Merck's explanation that Naproxen was cardioprotective. In the email, the analyst stated that the FDA had concluded that the heterogeneity of the studies included in Merck's meta-analysis obscured relevant facts. Edward Scolnick, Merck's lead scientist, forwarded the analyst's email to David Anstice. In the message to Anstice, Scolnick stated, "David, if he says this I will boil him in oil at the meeting. I have never seen any analyst provide data analysis on his own. I think merck [sic] should do something about him."

Ernst questioned Dr. Santanello about several marketing issues surrounding Vioxx and warning letters issued by the FDA. First, Ernst asked Dr. Santanello about a warning letter written by Thomas W. Abrams, director of the Drug Marketing, Advertising, and Communications division of the FDA to Raymond V. Gilmartin, President and Chief Executive Officer of Merck. The letter stated that it was written in response to a promotional campaign

---

2. Searle Pharmaceuticals developed Celebrex.

for Vioxx that "minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for Vioxx." The letter requested that Merck take immediate corrective action including "ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx," and issuing a "Dear Healthcare provider" letter to correct false or misleading impressions or information. The FDA's letter stated that there were no adequate and well-controlled studies of Naproxen supporting Merck's claim of cardio-protection. The FDA warned Merck not to minimize the risks associated with Vioxx use and to correct the misrepresentation in the medical community. Dr. Santanello testified that Merck took the allegations seriously and acted upon them.[3]

Dr. Santanello further testified about a second letter sent by the FDA to Merck. In that letter, dated December 15, 1999, the FDA addressed two "homemade promotional pieces," entitled "Ten Reasons Why Vioxx is Better than Celebrex," and "Vioxx vs. Celebrex Poem." In the letter, the FDA warned that the promotional materials misrepresented the safety profile for Vioxx and were lacking in fair balance. The FDA stated that the "homemade" promotional pieces misrepresented the gastrointestinal safety profile of Vioxx and improperly represented that Vioxx was more effective than Celebrex.[4] The letter also referred to audio conferences being given by a physician. The letter noted that Merck had misrepresented the number of heart attacks suffered by study participants who were taking Vioxx. The FDA further stated that Merck's suggestion that COX-2 inhibitors have an overall safety profile that is superior to other NSAIDs is misleading. In response, Merck terminated its relationship with the physician and requested that he not produce further conferences. Merck also disseminated a letter to health care providers explaining that the statements made by the physician were not accurate. The FDA reviewed Merck's corrective actions and determined that the matter had been "satisfactorily resolved."

In a letter dated July 16, 1999, the FDA's Division of Drug Marketing, Advertising, and Communications asked Merck to immediately cease certain broadcast advertisements for Fosamax, and a print advertisement for Vioxx. The Vioxx advertisement represented an X-ray image of a hand with superimposed red markings at the joints. The FDA stated that the advertisement should cease immediately because it failed to (1) provide adequate information regarding the product's usage, (2) include risk information, and (3) present a brief summary of necessary information related to side effects, contraindications, and effectiveness, or provide ad-

---

3. On June 16, 1998, one year prior to the approval of Vioxx, Merck received a warning letter from the FDA stating that Merck had engaged in "a continuing pattern and practice of widespread corporate behavior to avoid compliance with the regulations concerning the disclosure of risk information." The letter referred to "promotional materials for a variety of products," and stated that those materials suggested "a corporate policy toward minimizing the presentations of [risk] disclosures."

4. One of the homemade promotional pieces addressed in the letter was a poem designed to tout the superiority of Vioxx over Celebrex. In its warning letter, the FDA stated that the poem "makes a broad superiority claim comparing Vioxx not only to the class of NSAIDS, of which it is a member, but to all analgesic and anti-inflammatory therapies available for the management of pain." The FDA described this "global superiority claim" as "false or misleading." Merck agreed that the homemade promotional piece was wrong and removed it from distribution.

equate provision for the dissemination of full product labeling in connection with the broadcast advertisement. Ernst also questioned Dr. Santanello about a warning letter Merck received concerning promotional materials for drugs other than Vioxx. In it, the FDA warned Merck about issuing a press release that was false or misleading with regard to the cardiovascular safety profile of Vioxx. The FDA described Merck's description of Vioxx's favorable cardiovascular safety profile as "simply incomprehensible."

Ernst introduced into evidence a letter dated January 22, 2001, addressed to the president of Merck and written by Dr. James Fries, a professor of medicine at the Stanford University Medical Center. Dr. Fries was a principal investigator for a National Institute of Health ("NIH") funded data bank called Arthritis, Rheumatism, and Aging Medical Information System ("ARAMIS"). The organization worked toward reducing the frequency of serious gastrointestinal events from traditional NSAIDs and believed that the COX–2 inhibitors were the "best approach toward better drug safety in this area." Dr. Fries received a telephone call from Dr. Louis Sherwood of Merck expressing concern over lectures given by Dr. Gurkirpal Singh of ARAMIS, which were reported to be "anti-Merck and specifically anti-Vioxx." Dr. Fries wrote, "Dr. Sherwood suggested that if this continued Dr. Singh would 'flame out' and there would be consequences for myself and for Stanford." Dr. Fries wrote to express his concerns about underemphasized drug toxicity problems with Vioxx, especially at the 50–milligram dose. He also expressed concern that Merck was engaging in "damage control by intimidation." The letter further expressed concern with the issue of "sup-

pression of data by Merck and a consistent pattern of intimidation of investigators by Merck staff." [5]

The jury also viewed three television advertisements for Vioxx, none of which warned of the cardiovascular risks of taking Vioxx. Dr. Santanello testified that the advertisements were approved by the FDA and, at the time the advertisements were published, Merck believed the VIGOR results were skewed by the cardioprotective effects of Naproxen. Ernst introduced evidence of a brochure used in Merck's sales training sessions. The brochure is entitled, "Dodge Ball Vioxx," and contains the word "DODGE!" written on the front page. The brochure addresses several objections physicians may have to using Vioxx including, "I am concerned about the cardiovascular effects of Vioxx." Dr. Santanello testified it was her understanding that the marketing department used this brochure as a game to teach the salespeople how to answer questions for physicians. She stated that despite its name, the technique had "nothing to do with dodging questions."

Ernst also showed a sales instruction video in which sales representatives were instructed that if physicians asked whether Vioxx caused heart attacks, the representatives were to answer, "[t]hat is not true." Sales representatives were encouraged to tell physicians that their friends and family members continued to take Vioxx even after negative news articles were published in the New York Times and the Journal of the American Medical Association.

Ernst further questioned Dr. Santanello about a document used by the marketing department to track physicians who prescribed anti-inflammatory drugs. The document listed physicians nationwide and

---

5. The trial court admitted the letter for the limited purpose of showing notice to Merck, not for the truth of the matters contained therein.

the sales representatives assigned to those physicians. The intent was to "neutralize" the physicians through various tactics including awarding grant money to physicians if they agreed to prescribe Vioxx instead of other anti-inflammatories. Sales representatives received bonuses tied to the physicians' prescription rates for Vioxx. Dr. Santanello explained that the term "neutralize" referred to the representatives' intent to educate the physicians on Vioxx so they could be fair and balanced. She further explained that it was common for physicians to request financial support for their research from a number of different industries.

## B. Dr. Wallace Prescribes Vioxx to Mr. Ernst

Dr. Santanello testified that Merck subscribes to a service that tracks every prescription a physician writes so it can target physicians who are prescribing drugs other than those sold by Merck. Dr. Brent Wallace, the physician who prescribed Vioxx for Ernst, was on Merck's list of high NSAID prescribers who "should be detailed on Vioxx first." By August of 2000, Dr. Wallace's new prescription share for Vioxx was up to 45.9 percent. Dr. Santanello's testimony was unclear as to what percentage Dr. Wallace had been writing prior to being targeted. On April 18, 2001, Merck sent a letter to Dr. Wallace explaining the results of the VIGOR study. Attached to the letter was the full VIGOR report as published in the New England Journal of Medicine. The letter stated that as of February 2000, the rate of cardiovascular events in the VIGOR study was .4 percent. In the subsequent final analysis, which included all events after the February 2000 cut-off date, the rate of cardiovascular events was .5 percent. The VIGOR study reported the .4 and .5 percent rates referred to *serious* thrombolic cardiovascular events, not all

cardiovascular events. Dr. Santanello explained that serious cardiovascular events included heart attacks and strokes, while all cardiovascular events encompassed high blood pressure, congestive heart failure, and other events not necessarily involving a thrombus, or blood clot.

On September 15, 2000, Dr. Wallace prescribed a daily 25–milligram dose of Vioxx to Bob Ernst to alleviate tendinitis pain in Ernst's hands. On May 6, 2001, approximately one hour after Ernst went to bed, appellee noticed that he was unconscious and was having trouble breathing. Appellee called emergency medical personnel and began cardiopulmonary resuscitation ("CPR"). Ernst never regained consciousness and was pronounced dead shortly after arriving in the emergency room. An autopsy was performed the following morning, and the report listed his death as cardiac arrhythmia secondary to coronary atherosclerosis.

On September 23, 2004, an external safety board monitoring the results of a separate long-term study entitled Adenomatous Polyp Prevention on Vioxx ("APPROVe"), which was designed to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, informed Merck that the interim data from this study also showed a significantly increased rate of cardiovascular events in the Vioxx arm as compared to the placebo arm of the study. One week later, on September 30, 2004, Merck voluntarily withdrew Vioxx from the market.

## C. Trial Court Proceedings

Appellee, Carol Ernst, sued Merck alleging that the ingestion of Vioxx caused the death of her husband. Ernst's suit was tried to a jury, which found that the design and marketing of Vioxx was defective, that Merck's negligence proximately

caused Ernst's death, and that the harm to Ernst resulted from malice attributable to Merck. The jury awarded a total of $24,450,000 in compensatory damages and assessed $229,000,000 in exemplary damages. Pursuant to section 41.008 of the Texas Civil Practice and Remedies Code, the trial court reduced the assessment of exemplary damages and entered judgment for appellee in the sum of $26,100,000. From that judgment, Merck appeals.

Merck raises four issues in which it challenges the legal and factual sufficiency of the evidence to support the jury's verdict on causation, strict liability, negligence, malice, and damages. Merck further contends that the trial court erred in instructing the jury and in admitting certain evidence.

## II. ANALYSIS

In its first issue, Merck argues that appellee failed to present legally sufficient evidence of specific causation. At trial, Ernst alleged that Mr. Ernst's death was caused by a blood clot triggered by Vioxx. The trial court excluded all evidence of non-thrombotic causes of Ernst's death. Merck argues that Ernst failed to present competent evidence of the existence of a clot.

The test for legal sufficiency "must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). Legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* Although the reviewing court must consider evidence in the light most favorable to the judgment, and indulge every reasonable inference that would support it, if the evidence permits only one inference, nei-

ther jurors nor the reviewing court may disregard it. *Id.* at 822. We sustain a legal-sufficiency challenge when the record discloses one of the following situations: (1) complete absence of evidence establishing a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence of a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810.

A thrombotic cardiovascular event is a myocardial infarction or sudden cardiac death triggered by a thrombus, or blood clot. The autopsy report reflected that Ernst suffered mild to severe atherosclerosis in the left anterior artery and left circumflex coronary arteries and listed the cause of death as "cardiac arr[h]ythmia secondary to coronary atherosclerosis." Both parties' experts testified that the usual cause of a myocardial infarction is a blood clot formed in response to a rupture or fissure of atherosclerotic plaque in the inner lining of the artery. It is undisputed that no blood clot or fissure of atherosclerotic plaque was found during the autopsy.

### A. Ernst's Evidence

Admitting that there is no direct evidence of a blood clot, Ernst contends that there is sufficient circumstantial evidence to support the jury's verdict. Prior to trial, the court held a hearing on several pretrial motions including Merck's motion to exclude evidence based on *Merrell Dow Pharm. v. Havner*, 953 S.W.2d 706 (Tex. 1997). No evidence was introduced at the hearing, but the court heard arguments of counsel. Merck's counsel explained several medical terms that would be used at trial beginning with "atherosclerosis," which is the disease that involves deposition of plaque on the walls of the arteries, sometimes referred to as "hardening of the

arteries." When atherosclerosis becomes advanced, a piece of plaque can rupture, and the body responds by forming a "thrombus," or "blood clot," around the plaque. If that clot breaks away, it will often block, or occlude, a blood vessel leading to a "myocardial infarction," commonly known as a heart attack. Counsel further explained that "cardiac arrythmia" is "essentially an electrical problem with the heart." Finally, the term "sudden cardiac death" refers to the death of an individual usually within a certain period of time after the onset of symptoms. Sudden cardiac death encompasses both myocardial infarction and cardiac arrythmia.

After hearing arguments of counsel, the court permitted Ernst's expert testimony on causation, but excluded all evidence of non-thrombotic causes of Mr. Ernst's death. The circumstantial evidence on which Ernst relies is the testimony that a clot could have been present, then could have disappeared through various means prior to autopsy. Appellee presented the testimony of three experts who testified that Vioxx caused Ernst's death: Dr. Isaac Wiener, Dr. Maria Araneta, and Dr. Benedict Lucchesi.

### Dr. Isaac Wiener

Dr. Isaac Wiener is a practicing cardiologist who specializes in cardiac arrhythmia and testified that cardiac arrhythmia refers to rhythm abnormalities that occur in the electrical system of the heart. He is a clinical professor of medicine at the University of California at Los Angeles. He conducts peer review for the Journal of the American College of Cardiology, the American Heart Journal, and the Journal of Arrhythmias. and has published several articles on cardiac arrhythmia.

Dr. Wiener explained for the jury how the heart works as a pumping muscle to circulate blood throughout the body. He further explained the electrical system that acts as a natural pacemaker for the heart. The heart uses electrical signals to ensure that it beats correctly. If the electrical system is interrupted, an arrhythmia occurs. If the arteries in the heart are blocked, the heart will not get enough oxygen and will suffer abnormal rhythm. A thrombus, or blood clot, can block an artery causing a lack of oxygen, or ischemia, to the heart. An "acute ischemic event" occurs when the heart suddenly does not get enough blood.

In Dr. Weiner's opinion, Ernst's arrhythmia was "caused by ischemia, by inadequate blood flow to the heart." Because Ernst died suddenly after the onset of symptoms, no reliable test could be performed to determine whether he suffered a myocardial infarction. Dr. Weiner admitted that the medical examiner, in conducting the autopsy, found no evidence of recent or remote infarction or a thrombus. The cause of Ernst's arrhythmia according to the autopsy report is coronary atherosclerosis. The most common predisposing factor to sudden cardiac death is coronary atherosclerosis. In explaining how Vioxx contributed to Ernst's death, Dr. Wiener testified:

> [I]schemic ventricular fibrillation, sudden cardiac death, the most common thing that causes sudden cardiac death, that causes someone to just keel over the way Mr. Ernst, unfortunately, did is ventricular fibrillation, which is an abnormal heart rhythm related to blockages in his artery. And that's what he had. And does the only time it happen[s] is to people taking Vioxx? No. Unfortunately it happens to people not taking Vioxx. But the evidence suggests that Vioxx makes it significantly more common.

### Dr. Maria Araneta

Dr. Maria Araneta, the assistant medical examiner who performed the autopsy, tes-

tified that Ernst's left coronary arteries were 50– to 75–percent blocked by calcified plaque. She did not find a blood clot when she performed the autopsy on Ernst's body. She did not see evidence of a myocardial infarction, or heart attack, because Ernst died within an hour of initially showing symptoms. To affirmatively diagnose a myocardial infarction, the physician must observe either death of the heart muscle tissue or the presence of cardiac enzymes. To observe either death of the tissue or the presence of cardiac enzymes, the individual must have lived six to eighteen hours after suffering the myocardial infarction.[6]

The most likely cause of Ernst's arrhythmia, Dr. Araneta testified, was an acute ischemic event. As the potential cause of such an event, she said, "Something blocked that artery that was already narrowed, either a clot, a fissure, block or ruptured atheroma, none of which I saw, but it—these things could be dissolved." According to Dr. Araneta, the clot could have spontaneously dissolved, been dislodged through vigorous CPR, or could have been too small to detect on autopsy. Not only did she not see a clot, but she observed no rupturing or fissuring of the atherosclerotic plaque in the coronary arteries. In fact, the plaque in Ernst's arteries was intact and so hard that the arteries had to be de-calcified before they could be sectioned for autopsy. If she attempted to section the arteries prior to de-calcification, her knife would have been broken due to the hardness of the arteries. Contrary to her report, at trial Dr. Araneta was "leaning towards more likely than not" that Ernst suffered a myocardial infarction.

### Dr. Benedict Lucchesi

Dr. Lucchesi is a professor of pharmacology at the University of Michigan and testified that he has an undergraduate degree in pharmacology, a master's in physiology and a doctorate in pharmacology and has researched arrhythmia since the 1950's. He participated on the team that invented the first pacemaker, another team that invented the nitroglycerin patch, and another team that invented the first beta-blocker.

Dr. Lucchesi testified as follows: Ernst had atheromatous plaque formed on the inside walls of his arteries. This is common among people 59–years–old as Ernst was because as individuals age, cholesterol causes build-up of plaque in the arteries. Relying on the theories behind the Fitzgerald Hypothesis, Dr. Lucchesi testified that when COX–2 is inhibited as with Vioxx, blood platelets can aggregate around an area in the artery where plaque has formed. By disturbing the balance of prostacyclin and thromboxane in the blood, "the potential for the platelets to aggregate" is increased. Vioxx can be taken by many people without difficulty, but should not be taken by patients with underlying cardiovascular disease.

Dr. Lucchesi admitted that Ernst did not suffer a myocardial infarction, but speculated that he could have suffered reperfusion injury when a blood clot, which was never found, dissolved. Reperfusion injury occurs when the heart has been ischemic and blood flow suddenly returns to the heart. Microemboli, which are small blood clots that move, can cause reperfusion because the flow of blood to the heart is intermittent. Prior to his death, when Ernst said he was not feeling well, he was most likely suffering from microemboli. Dr. Lucchesi's reperfusion theory is based on a study performed on animals and published in Circulation Jour-

---

6. All experts agreed on this conclusion.

nal, which states that "the causal involvement of microemboli in death from malignant arrhythmias and/or cardiac failure remains unclear." Dr. Lucchesi admitted there was no evidence of microemboli in Ernst's autopsy, but stated that, "[O]ne of the possibilities why a clot could not be found is because the efforts to administer CPR could have dislodged that clot and sent it somewhere, elsewhere, where it could not be localized and observed." He admitted that he is not aware of any case reports that suggest that CPR can dislodge a clot.

He opined that Ernst "died of an arrhythmia, precipitated by a transient ischemic event leading to ventricular fibrillation." Dr. Lucchesi explained that ischemia is a lack of blood flow. Most likely, because Ernst was taking Vioxx, he died due to a temporary interruption of blood flow based on platelet aggregation due to the inhibition of COX–2. Although there was no evidence that the temporary interruption of blood flow was due to a clot, Dr. Lucchesi testified that blood clots can naturally dissolve through the process of fibrinolysis. Although all experts testified that the process of fibrinolysis ends at death, Dr. Lucchesi testified that when an individual dies, all his blood clots, and then, over a period of time, the blood turns to liquid again.

Ernst had the most severe atherosclerosis in the anterior descending coronary artery. He also showed moderate to severe calcific atherosclerosis in the left circumflex coronary artery. "Mr. Ernst's demise was caused by an arrhythmia initiated by ischemia." Ernst had coronary disease, but was able to continue vigorous exercise because the coronary arteries have a "tremendous reserve capacity." Because Vioxx blocks COX–2 and "in view of the fact that he had underlying vascular disease, which makes him a candidate,

along with Vioxx, for such a serious event, my only conclusion would be that Vioxx contributed significantly to this."

Dr. Lucchesi did not rule out coronary atherosclerosis as the cause of Ernst's arrhythmia. Ernst argues that because Mr. Ernst's atherosclerosis was "asymptomatic," it was ruled out as a cause of his death. In that regard, Dr. Lucchesi testified that Mr. Ernst "had a normal-looking heart except for the disease within the coronary arteries, which are asymptomatic." He further explained that the term "asymptomatic" refers to the fact that Ernst was able to continue vigorous exercise and an active lifestyle in spite of moderate to severely clogged arteries.

## B. Merck's Evidence

In support of its contention that there was no evidence Ernst suffered a thrombotic event, Merck presented the testimony of Dr. Thomas Wheeler and Dr. Craig Pratt.

### Dr. Thomas Wheeler

At the time of trial, Dr. Wheeler was the interim chairman of the pathology department at the Baylor College of Medicine. He testified that autopsies are performed to determine the cause of death, and, in some cases, the manner of death. In determining the cause of death when sudden cardiac death occurs, the medical examiner first rules out all causes other than the heart. When those causes have been ruled out, the physician focuses on a careful examination of the heart. Approximately 85 percent of individuals who die from sudden cardiac death have severe atherosclerosis. At least half of the people who have severe atherosclerosis do not experience symptoms. In some of those people, death is the first symptom of the disease.

During life, risk factors for heart disease play a role in helping a physician determine whether a patient needs to have a

risk assessment, but, for an autopsy, risk factors mean nothing. In an autopsy the physician can see the cause of death such that risk factors do not come into play. Myocardial infarctions are diagnosed by determining a patient's symptoms, measuring cardiac enzymes, or measuring electrical impulses in the heart through an electrocardiogram. None of those tests is effective after death.

In reviewing Dr. Araneta's autopsy report, Dr. Wheeler reviewed the microscopic slides of tissue taken from the organs at the time of the autopsy. In his opinion, the autopsy was thoroughly performed in a professional manner. He agreed with Dr. Araneta's finding that the cause of death was cardiac arrhythmia secondary to coronary atherosclerosis. Fatal arrhythmias can and do occur without a myocardial infarction. According to the autopsy, Ernst's arrhythmia was caused by severe atherosclerosis. Ernst's heart showed signs of prior ischemic episodes. Dr. Wheeler saw no evidence of plaque rupture or fissure, which is necessary for a thrombus to form. In conducting the autopsy, Dr. Araneta made slices of the arteries that were one to two millimeters thick, which is the best way for a pathologist to find a clot. Despite a thorough examination of very thin slices of Ernst's coronary arteries, Dr. Araneta did not find a blood clot. If a clot had been present, she would have been able to see it.

It is not at all uncommon to find on autopsy severe atherosclerosis, but no clot or myocardial infarction. With the degree of atherosclerosis Ernst experienced in two coronary arteries, he was susceptible to an arrhythmia at any time. The artery in which Ernst experienced severe atherosclerosis is the one most associated with sudden death. The plaque had been building up in Ernst's arteries for decades. Blood clots form in arteries when plaque

cracks and ruptures causing the contents of the plaque, i.e., cholesterol and other material, to get into the bloodstream, which causes the clot to begin to form. Calcific plaque, the type that was in Ernst's arteries, is least likely to rupture or fissure to initiate a blood clot. One would ordinarily not expect a blood clot to form, but if a clot were to form around such plaque, there would be evidence, even if the clot dissolved or moved, of a rupture and a hemorrhage into the plaque at the point of rupture or fissure.

Because Dr. Araneta cut the arteries in such thin sections, the fact that she did not find a clot essentially rules out the possibility of a clot's having caused Ernst's death. The clot could not have dissolved after death. The scenario described by Dr. Lucchesi in which all of the blood in the body clots and then dissolves could only occur if the body had not been preserved as Ernst's body was at the funeral home. If a clot were there, it would not have dissolved, but would have been preserved.

Dr. Wheeler testified that the possibility of paramedics breaking up a clot through CPR is "a preposterous notion." There is no support in scientific or medical literature for such a theory. He has neither independently learned of CPR dislodging or fragmenting a clot, nor has he read any anecdotal case reports supporting the theory. After hearing Dr. Araneta's and Dr. Lucchesi's testimony, he researched the possibility of CPR's dislodging a clot and found no scientific or medical support for the theory. Even if CPR could theoretically have dislodged a clot, it could not have dislodged a clot in Ernst's arteries because the calcified plaque made his arteries too hard to succumb to pressure from CPR compressions. In other words, if Dr. Araneta's knife could not cut the arteries, they could not have succumbed to

pressure of CPR compressions to the degree that a possible blood clot could have been dislodged. Not only is there no scientific support for the theory, but Dr. Wheeler opined, "I don't think it makes sense from an anatomic standpoint as well."

As to the theory of the clot breaking into small pieces, a blood clot is not brittle, but is supple, like a piece of bubble gum, making it almost impossible to break into small pieces. Further, Dr. Wheeler examined Dr. Araneta's slides, and, if the clot had broken into several tiny pieces, he would have been able to see them under the microscope. Dr. Wheeler re-examined the small arteries in the heart after hearing plaintiff's experts' testimony, and, again did not see evidence of a clot. Not only was there no clot, but there was no rupture or fissure of the atherosclerotic plaque necessary to formation of a clot. Dr. Wheeler opined that Ernst's death was caused by severe atherosclerosis, which led to a fatal arrhythmia.

### Dr. Craig Pratt

Dr. Craig Pratt is the director of the coronary care unit at Methodist Hospital, a professor of medicine at Baylor College of Medicine, and the director of research at the DeBakey Heart Center. He testified that ischemia is an imbalance in the heart muscle that results from a significant blockage in one of the coronary arteries. Atherosclerosis is a process in which blockage builds up on the inside of arteries, frequently leading to ischemia. Clot-busting drugs are very effective, but usually take 60 to 90 minutes to dissolve, or lyse, a clot.

Ernst had moderate to severe stenosis in two of his coronary arteries. The extent of the blockage in Ernst's arteries was not known until after his death. Atherosclerosis in the coronary arteries is the most common foundation for ventricular fibrillation, which is the type of arrhythmia that caused Ernst's death. The experts agree that cardiac arrhythmia can occur without a blood clot. With regard to cardiac risk factors, Dr. Pratt testified, "Risk factors are something that matter when someone is alive. Once we know at autopsy they have moderate to severe atherosclerosis, then whether or not they were identified adequately in life really doesn't matter."

Within reasonable medical probability, Ernst died of ventricular fibrillation brought on by moderate to severe atherosclerosis. The atherosclerosis led to an ischemia, which triggered the life-threatening arrhythmia. The paramedics found evidence of very broad ventricular tachycardia and ventricular fibrillation. There is no evidence at all that Ernst had a myocardial infarction. Patients who die within one hour of the onset of symptoms are much more likely to have ventricular fibrillation due to ischemia, not due to myocardial infarction. "[T]he number-one primary driver of his arrhythmia event was his severe underlying atherosclerosis." It is "impossible to imagine" that the body's natural clot-dissolving system, which ordinarily takes 24 to 48 hours to dissolve a clot, would have impacted Ernst's situation. Vioxx did not play a role in Ernst's death.

### C. Legal Sufficiency of the Evidence on Specific Causation

 Causation in toxic tort cases is discussed in terms of general and specific causation. *Havner,* 953 S.W.2d at 714. General causation describes whether a substance is capable of causing a particular injury or condition in the general population, while specific causation describes whether a substance caused a particular

individual's injury.[7] *Id.* In many cases, as in this case, it is impossible to present direct evidence that the substance caused a litigant's injury. *Id.* at 715. Proving one type of causation does not necessarily prove the other, and both are needed for a plaintiff in a toxic-tort suit to prevail. *Coastal Tankships U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 602 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). "[T]o survive a legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies." *Havner,* 953 S.W.2d at 720. In the case of Vioxx, the claimant must show he suffered the injury Vioxx is alleged to cause, i.e., a thrombolic cardiosvascular event. Further, if there are other plausible causes of the injury or conditions that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *Id.*

■ Each expert who testified on the issue of specific causation testified that Ernst's death was caused by an "acute ischemic event." In reciting her experts' testimony as evidence of causation, Ernst equates an "acute ischemic event" with a "clot." The two terms are not equivalent. Ernst's own expert, Dr. Weiner, defined an acute ischemic event as "events where suddenly the heart doesn't get enough blood." There are several possible causes of ischemia; not all are caused by blood clots. Even Ernst's experts testified that arrhythmias can occur without thrombotic causes. Dr. Weiner testified that, "Arrhythmias can occur completely unrelated to heart attacks." Dr. Araneta testified that "[ventricular fibrillation] by itself [is] not a clotting problem."

Ernst further relies on the testimony of Dr. Egilman, who testified that Vioxx was a contributing cause to Ernst's death. In explaining how Vioxx contributed to Ernst's death, Dr. Egilman explained, "The Vioxx got into his blood. It was in his blood at the time he had his heart attack. It prevented the blood thinner from unclogging a clot or prevented it from plaquing, and that he had a heart attack because of not enough oxygen getting by when he had a clot." Dr. Egilman's testimony assumes that (1) a clot was found, and (2) Mr. Ernst suffered a heart attack, or myocardial infarction. Because there was no evidence of clot or myocardial infarction, Dr. Egilman's conclusion is based on a false assumption.

Another of Ernst's experts, Dr. Weiner, testified that Vioxx was a "significant contributing factor" in Ernst's death. Dr. Weiner's testimony was based on the fact that, in his opinion, Ernst "had a cardiac arrest. And this is part of the spectrum of acute ischemic events—in other words, events where suddenly the heart doesn't get enough blood." Dr. Weiner also testified that Ernst's arrhythmia was caused by ischemia, or an inadequate blood flow to the heart. Dr. Weiner's opinion assumes, without evidence, that the inadequate blood flow was caused by a clot. Further, Dr. Weiner admitted that he could not testify with certainty that Ernst suffered a myocardial infarction. He also admitted that the autopsy report contained no evidence of a clot.

■ Ernst also relies on circumstantial evidence that a clot could have been present, then could have disappeared

<hr>

7. There is some evidence that Vioxx use at a certain dose and duration is associated with an increased risk of thrombotic cardiovascular events. After reviewing the evidence and considering the appropriate standard of review, we conclude there is some evidence to support a finding of general causation.

through various means prior to the autopsy. In claims supported by only meager circumstantial evidence, the evidence does not rise above a scintilla if jurors would have to guess whether a vital fact exists. *City of Keller,* 168 S.W.3d at 813. When the circumstances are equally consistent with either of two facts, neither fact may be inferred. *Id.* When the circumstantial evidence of a vital fact is meager, we must consider not just favorable but all the circumstantial evidence, and competing inferences as well. *Id.* at 814. Therefore, we address the circumstantial evidence that although a clot was not found, it could have existed, then disappeared.

First, Dr. Araneta opined that a clot could have naturally dissolved through a process called fibrinolysis. However, Dr. Araneta admitted that she would not expect a clot to naturally dissolve after death. Dr. Lucchesi explained that certain types of clots could naturally move through the blood vessels, but did not specify how quickly this process could take place in the body. Contrary to Dr. Araneta's and Dr. Lucchesi's testimony, Dr. Pratt testified that the possibility of a clot dissolving on its own was not a viable hypothesis because the natural process of fibrinolysis takes 24 to 48 hours and only continues while the patient is alive.

Next, Dr. Araneta and Dr. Lucchesi speculated that vigorous CPR could have dislodged a blood clot or caused it to fragment into such small pieces that it could not be detected on autopsy. Dr. Araneta testified that emboli could have been dislodged and fragmented into such small pieces that she could not have seen them on her microscope. She described this theory as a "guess," her "estimate," and a "possibility." Dr. Lucchesi admitted that he was aware of no published literature suggesting that CPR could dislodge or move clots.

To be considered reliable circumstantial evidence of causation, an expert's opinion must be independently evaluated to determine whether the opinion is reliable. *Havner,* 953 S.W.2d at 713–14. An expert's bare opinion will not suffice to support a jury's verdict. *Id.* at 711. The substance of the testimony must be considered. *Id.* Factors to which a reviewing court should look in determining the reliability of scientific testimony are: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; (6) the nonjudicial uses that have been made of the theory or technique; and (7) any other factor that is helpful to determine the reliability of the scientific evidence. *Id.* at 714 (citing *E.I. duPont de Nemours and Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995)). Causation opinions based on possibility, speculation, and surmise are no evidence. *Havner,* 953 S.W.2d at 711–12. Expert opinions must be supported by facts in evidence, not conjecture. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003).

Dr. Araneta's and Dr. Lucchesi's opinions are not supported by scientifically reliable facts in evidence. Ernst's experts postulate that Mr. Ernst suffered a thrombotic cardiovascular event, but at the time of his death, less than one hour later, the thrombus had been dislodged and fragmented into such small pieces that it could not be seen under a microscope. Because there is no evidence that a clot existed and was dislodged, the experts' opinions are mere speculation. Moreover, we cannot

disregard Dr. Wheeler's uncontroverted testimony that there is no support in scientific or medical literature for such a theory. We also cannot disregard Dr. Wheeler's uncontroverted testimony that Mr. Ernst's atherosclerosis would have prevented the arteries from succumbing to CPR compressions. Dr. Araneta testified that Mr. Ernst's arteries were so hardened by atherosclerosis that they had to be soaked in acid before she could slice them for examination. Dr. Wheeler explained that if Mr. Ernst's arteries were so hard that they would have broken Dr. Araneta's knife, the arteries could not have succumbed to the pressure of CPR compressions to the degree that a possible blood clot could have been dislodged.

Appellee points to Dr. Araneta's testimony that she rarely finds a clot on autopsy; therefore, appellee argues, the failure to find a clot does not rule out the possibility of a myocardial infarction. Dr. Araneta's testimony, however, referred to cases in which the autopsy revealed pathological evidence of myocardial infarction, *i.e.*, dead or obviously infarcted muscle tissue. Every expert agreed that Ernst died too suddenly for his heart muscle tissue to show signs of death. Moreover, the trial court excluded any evidence that ingestion of Vioxx is associated with non-thrombotic cardiovascular events because the theory was not supported by scientifically reliable evidence. Ernst directs our attention to Dr. Araneta's and Dr. Lucchesi's opinions that "something" triggered the ischemic event suffered by Mr. Ernst. However, there is no competent evidence that a blood clot triggered by Vioxx ingestion was the "something" causing his death.

Ernst argues in her motion for rehearing that "[t]he statement that there is no direct evidence of a myocardial infarction is misleading because Mr. Ernst died of a sudden cardiac death." By making this statement, appellee seems to imply that sudden cardiac death is always the result of a myocardial infarction. Appellee's own expert, Dr. Weiner, explained that sudden cardiac death is a general term meaning simply that a person died within six hours of the onset of symptoms. Death can result from arrhythmia, myocardial infarction, or other means related to the heart. Ernst cites Merck's expert, Dr. Wheeler, as stating that sudden cardiac death is cardiac arrest. Dr. Wheeler's testimony, however, is no evidence that Ernst suffered a thrombotic event or even that he suffered a myocardial infarction. In the testimony referred to, appellee's attorney recited the Merck manual definition of cardiac arrest as "absent or inadequate ventricular contraction[.]" Dr. Wheeler agreed with that definition of cardiac arrest and explained that it encompassed many cardiac events, not just myocardial infarction. He also agreed that some doctors use the terms "cardiac arrest" and "sudden cardiac death" interchangeably. He did not testify, however, that Ernst suffered a myocardial infarction triggered by a blood clot.

### D. Differential Diagnosis

Appellee argues that she introduced some evidence of specific causation based on the process of differential diagnosis. A differential diagnosis is a clinical process whereby a doctor determines which of several potential diseases or injuries might have caused the patient's symptoms by ruling out possible causes. *Coastal Tankships*, 87 S.W.3d at 604. In a differential diagnosis, a doctor compares a patient's symptoms to symptoms associated with known diseases, conducts physical examinations of the patient, collects data on the patient's history and illness, and then analyzes that data until reaching a final diagnosis and makes a decision on how to properly treat the patient's injury or ill-

ness. *Id.* In the case of an autopsy, unlike a differential diagnosis, the medical examiner is not confined in her analysis to observable outward symptoms; she is able to examine and test vital organs.

Appellee contends that the failure to find a blood clot does not defeat causation, arguing that Dr. Lucchesi ruled out all non-thrombotic causes of Ernst's arrhythmia through the use of differential diagnosis. Dr. Lucchesi testified that Ernst was under 65 years old, exercised regularly, had not smoked for more than 15 years, and did not have a family history of heart disease. Ernst contends that by ruling out other potential risk factors for sudden cardiac death, the evidence is legally sufficient to show that Mr. Ernst suffered a myocardial infarction triggered by a blood clot. Dr. Lucchesi's testimony that Ernst did not exhibit risk factors for cardiovascular disease does not reasonably support the conclusion that he suffered a thrombotic cardiovascular event.

Appellee misapprehends the nature of differential diagnosis. This diagnostic process does not contemplate the consideration of risk factors; it is a consideration of symptoms and potential causes. In arguing that there is some evidence through the use of differential diagnosis, Ernst argues that her medical experts excluded all other *risk factors* for heart attack except the "Vioxx factor." A differential diagnosis requires the exclusion of the likely *causes* until the most probable one is isolated. *Praytor v. Ford Motor Co.,* 97 S.W.3d 237, 244–45 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Appellee argues "the experts were able to exclude all risk factors for heart attacks except two— his gender and his daily intake of Vioxx." The exclusion of risk factors, however, does not equate to the exclusion of causes. Further, we cannot ignore Dr. Pratt's and Dr. Wheeler's uncontradicted expert testimony that risk factors have no application after death. Once an autopsy is performed, risk factors are not used to rule out potential causes of death.

Further, no expert ruled out atherosclerosis as a cause of Ernst's arrhythmia. If there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *Havner,* 953 S.W.2d at 720. As part of her burden on specific causation, Ernst was required to offer evidence excluding other causes of Mr. Ernst's death with reasonable certainty. *Id.* Ernst contends that Dr. Lucchesi ruled out atherosclerosis as a cause of Ernst's death because he testified that his atherosclerosis was "asymptomatic." However, Dr. Lucchesi and several other experts explained that the term "asymptomatic" referred to Mr. Ernst's ability to vigorously exercise and continue his daily routine without suffering symptoms of atherosclerosis such as fatigue, shortness of breath, and chest pain.

### III. CONCLUSION

The epidemiological evidence supports the conclusion that Vioxx use at a certain dose and duration is associated with an increased risk of thrombotic cardiovascular events. The experts' speculation that a clot "could have" existed, but "could have" dissolved, been dislodged, or fragmented gives rise to nothing more than conjecture. Facts from which an inference may properly be drawn must be established by direct evidence, not by other inferences. *Entex v. Gonzalez,* 94 S.W.3d 1, 8 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) ("a vital fact may not be established by piling inference upon inference"). Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we find

no evidence that Mr. Ernst suffered a thrombotic cardiovascular event, *i.e.*, a myocardial infarction triggered by a blood clot. Accordingly, Ernst failed to show that the ingestion of Vioxx caused her husband's death. Merck's first issue is sustained.[8]

The judgment of the trial court is reversed and judgment is rendered that appellee take nothing.

8. Because Merck's first issue is dispositive, we need not address its remaining issues or the issues raised in appellee's cross-appeal.