**Motion for En Banc Reconsideration Denied as Moot; Motion for Rehearing Granted; Majority and Dissenting Memorandum Opinions of March 30, 2023, Withdrawn; Judgment of March 30, 2023, Vacated; and Substitute Majority and Dissenting Memorandum Opinions filed June 25, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00765-CV

---

**ZHAOHONG WU AND YANJING ZHOU, INDIVIDUALLY AND AS NEXT FRIENDS OF K.W. AND E.W., THEIR MINOR CHILDREN, Appellants**

**V.**

**LUMBER LIQUIDATORS, INC. AND WOOD FLOOR ARTISANS, A GENERAL PARTNERSHIP COMPOSED OF VICTOR MARTINEZ-MEDINA AND AMBER LEE MARTINEZ, Appellees**

---

**On Appeal from the 164th District Court
Harris County, Texas
Trial Court Cause No. 2016-08354**

---

## SUBSTITUTE MAJORITY MEMORANDUM OPINION

Appellants Zhaohong "John" Wu and Yanjing Zhou, individually and as next friends of their minor children K.W. and E.W. (collectively, "the Wus"), sued

for damages related to mold growth in their home, alleging that the mold was caused by moisture introduced into the home by the alleged improper installation of bamboo flooring purchased from appellee Lumber Liquidators, Inc. and installed by appellee Wood Floor Artisans ("WFA" and, together with Lumber Liquidators, "Appellees").[1]

Appellees moved for a combined traditional and no-evidence summary judgment, challenging the Wus' asserted claims. Appellees also sought to exclude the testimony, opinions, and reports of the Wus' expert witnesses. The trial court rendered summary judgment against the Wus and granted Appellees' motions to exclude. The Wus filed this appeal, challenging the summary judgment and the exclusion of their expert witnesses.

We issued our original majority and dissenting memorandum opinions in this case on March 30, 2023. The Wus filed a motion for rehearing and a motion for en banc reconsideration. We deny the Wus' motion for en banc reconsideration as moot. We grant the Wus' motion for rehearing, withdraw the previous opinions of March 30, 2023, vacate our previous judgment of March 30, 2023, and issue these substitute majority and dissenting memorandum opinions. We render judgment affirming the trial court's judgment in part, reversing it in part, and remanding the case for further proceedings limited to the Wus' claims for (1) negligence, (2) breach of contract, (3) breach of express warranty, and (4) breach of implied warranty.

## BACKGROUND

### *Relevant Facts*

John Wu purchased bamboo flooring from Lumber Liquidators in September

---

[1] WFA is a general partnership and appellees Victor Martinez-Medina and Amber Lee Martinez are the general partners. We refer to these appellees collectively as WFA.

2

2014, intending to refloor several rooms in his Houston home. While he was shopping around for a flooring installer, John undertook leveling his home's floor. To complete this project, John purchased LevelQuik[2] and used it to "cover[] the complete floor" in February or March 2015.

After considering several options, John hired Lumber Liquidators to install the bamboo flooring. Lumber Liquidators engaged WFA, an independent contractor, to complete the job in April 2015. When WFA arrived at the Wus' home to perform the installation, they began the job by putting additional LevelQuik leveling compound on the home's floor. WFA then installed the bamboo flooring planks.

Two weeks later, John filed a complaint with Lumber Liquidators alleging WFA incorrectly installed the bamboo flooring. John also asserted that WFA "[w]asted my 5 bags of leveling material" and "damaged my floor leveling." John noted that the flooring was "buckling" approximately 15 days after the installation was completed.

Lumber Liquidators contracted with Inspect Solutions to investigate the reported flooring issues. Inspect Solutions examined the Wus' home and "found cupping and loose/buckled blanks throughout" the installed flooring. In its June 2015 report, Inspect Solutions concluded that there were "no site related issues present" but identified three installation-related issues: (1) failure to properly prepare or acclimate the bamboo flooring, (2) lack of expansion space between the bamboo flooring planks, and (3) failure to properly test the concrete slabs prior to

---

[2] LevelQuik is a "calcium aluminate based self-leveling underlayment that easily levels floors prior to the installation of ceramic tile, natural stone tile, resilient flooring, carpet, wood, and other floor coverings." *See* Customer Tile & Flooring Installation Systems, *LevelQuik RS (Rapid Setting) Self-Leveling Underlayment*, https://www.custombuildingproducts.com/product_categories/self-leveling-underlayments (last accessed June 11, 2024).

installation, which "will result in flooring being installed into a wet environment which produces moisture-related issues as in this case."

Lumber Liquidators also engaged glue-manufacturer MAPEI to investigate the flooring issues. Based on its investigation, MAPEI concluded the issues were not attributable to a product deficiency. MAPEI identified the same three "[p]ossible causes" identified in Inspect Solutions' report and concluded that "the conditions experienced for this project can be attributed to one or more" of them.

Lumber Liquidators began taking steps to replace the Wus' flooring in September 2015, again engaging WFA to complete the job. When WFA was in the process of removing the bamboo flooring planks in the Wus' home, they discovered mold between the glue and the planks. The installers also noted a crack in the foundation slab. Lumber Liquidators told John that the flooring installation would have to wait until the crack was fixed. In response, John said the widespread mold under the installed flooring made his home unlivable and necessitated his family relocating to a hotel due to health issues.

### *Legal Proceedings*

The Wus sued Appellees in February 2016, asserting claims for negligence, gross negligence, breach of contract, breach of express warranty, breach of implied warranty, and violations of the Deceptive Trade Practices Act-Consumer Protection Act (the "DTPA"). The Wus' amended petition identifies the same three flooring installation defects as those reported by Inspect Solutions and MAPEI: failure to test the subflooring prior to installation, failure to acclimate flooring materials, and failure to include expansion spaces between the planks. In addition to economic damages, the Wus also sought personal injury damages "resulting from [Appellees] causing [the Wus'] home to grow damaging levels of toxic mold for several months, and to which [the Wus] were unknowingly exposed

4

to their physical detriment."

Appellees filed answers and asserted affirmative defenses. Appellees also asserted cross-claims against each other.

Lumber Liquidators filed a combined traditional and no-evidence summary judgment motion, seeking judgment as a matter of law on the Wus' claims. *See* Tex. R. Civ. P. 166a(c), (i). Lumber Liquidators also filed motions to exclude the testimony, opinions, and reports of four of the Wus' expert witnesses. WFA joined Lumber Liquidators' summary judgment motion as well as its motions to exclude. *See* Tex. R. Civ. P. 58.

The trial court signed four orders granting Appellees' motions to exclude. The trial court also granted Appellees' combined summary judgment motion. Appellees filed a "Joint Notice of Nonsuit and Motion for Entry of Order of Dismissal," dismissing without prejudice their cross-claims against each other. The trial court signed an order on the joint notice on August 12, 2020, dismissing the remaining claims and stating that the matter "is final and appealable." The Wus timely appealed.

### ROADMAP

A motion for summary judgment "must stand or fall on the grounds expressly presented" therein. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). With this precept in mind, we use the arguments raised in Appellees' summary judgment motion as a foundation to examine the Wus' issues on appeal. Appellees delineated their traditional and no-evidence grounds as follows:

1. the Wus waived their implied warranty claims;
2. the Wus' express warranty claims should be dismissed because Lumber Liquidators honored the express warranty;

5

3. the Wus' claims for property and economic damages should be dismissed because the Wus agreed to a damages limitation in the Home Warranty Agreement;

4. the Wus failed to adduce any evidence of causation;

5. with respect to their personal injury claims, the Wus cannot prove causation as a matter of law;

6. there is no evidence to support the Wus' DTPA claims; and

7. there is no evidence to support the Wus' gross negligence claims.[3]

When a party moves for summary judgment on both traditional and no-evidence grounds, we address the no-evidence grounds first. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). As shown in our analyses below, we conclude there is more than a scintilla of evidence to support the causation element common to the Wus' claims. However, we conclude the trial court properly

---

[3] Responding to these summary judgment grounds, the Wus delineate their appellate issues as follows:

I. The trial court erred in dismissing the Wus' property damage claims.

    A. Appellees' motion for summary judgment failed to comply with Texas Rule of Civil Procedure 166a.

    B. The evidentiary record gives rise to an issue of fact with respect to causation.

    C. The trial court erred by striking evidence from two of the Wus' experts, Paula Vance and Mike Travis.

    D. The Wus brought forth sufficient evidence to maintain their implied warranty, express warranty, negligence, DTPA, and gross negligence claims.

II. The summary judgment record does not support dismissal of the Wus' personal injury claims.

    A. Appellees' summary judgment motion did not conclusively disprove causation.

    B. The trial court erred in striking evidence from two of the Wus' experts, Dr. Scott McMachon and Richard Pollock.

III. The trial court erred in denying the Wus' objections to Appellees' summary judgment evidence.

excluded Dr. McMahon's expert testimony and, therefore, the Wus did not produce any evidence with respect to specific causation as necessary to maintain their personal injury claims. We also conclude the Wus did not meet their evidentiary burden with respect to the challenged elements of their DTPA and gross negligence claims.

Turning to the traditional summary judgment grounds, we conclude the trial court erred in rendering summary judgment on the Wus' implied and express warranty claims. Similarly, Appellees did not conclusively prove that the Home Warranty Agreement's damage limitation applies to the Wus' claims.

But before delving into the substance of these summary judgment grounds, we begin with the Wus' third issue on appeal, in which they challenge the trial court's denial of their objections to Appellees' summary judgment evidence.

ANALYSIS

## I. The Wus' Evidentiary Challenge

In their third issue, the Wus assert the trial court erred in denying their authenticity and hearsay objections to nine exhibits filed with Appellees' summary judgment motion.

We review the trial court's decision on an evidentiary objection for an abuse of discretion. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *Zhu v. Lam*, 426 S.W.3d 333, 340 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The trial court abuses its discretion when it acts without reference to guiding rules or principles. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512-13 (Tex. 2017) (per curiam). We will reverse an erroneous evidentiary ruling only if it probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Interstate Northborough P'ship*, 66 S.W.3d at 220;

7

*Zhu*, 426 S.W.3d at 340.

In the trial court, the Wus briefed their evidentiary challenge, in its entirety, as follows:

> [The Wus] object to [Appellees'] summary judgment exhibits A, E, F, J, L, M, Q, R, and T on the basis that they are inadmissible on authenticity and hearsay grounds.

Overruling these objections in its September 3, 2020 order, the trial court stated that "Plaintiff's objections to defendant's exhibits do not adequately inform the Court of the bases upon which each contested exhibit should be excluded from the summary judgment record."

We agree with the reasoning underpinning the trial court's denial of the Wus' evidentiary objections. An evidentiary objection must be timely, specific, and afford the trial court an opportunity to cure the alleged error, if any. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1). But here, the Wus broadly asserted that certain exhibits were "inadmissible on authenticity and hearsay grounds" — exhibits totaling approximately 270 pages and comprised of invoices, emails, flooring installation instructions, a home appraisal, insurance claim searches, and a home inspection. The Wus did not explain whether their asserted objections applied to the exhibits in their entirety or only to certain portions therein; similarly, the Wus did not provide any reasoning or legal citations to support these objections' application to the challenged exhibits. Therefore, the trial court did not abuse its discretion by overruling the Wus' evidentiary objections. *See Speier v. Webster Coll.*, 616 S.W.2d 617, 619 (Tex. 1981) ("'A general objection to a unit of evidence as a whole . . . which does not point out specifically the portion objected to, is properly overruled if any part of it is admissible.'") (quoting *Brown & Root, Inc. v. Haddad*, 180 S.W.2d 339, 341 (Tex. 1944)).

We overrule the Wus' third issue.

## II.    Appellees' No-Evidence Summary Judgment Grounds

We turn to Appellees' no-evidence summary judgment arguments, in which they challenged (1) the causation element common to the Wus' claims, (2) the causation element specific to the personal injury claims, (3) the DTPA claims, and (4) the gross negligence claims.

### A.    Standard of Review

We review the trial court's grant of summary judgment *de novo*. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). In a no-evidence summary judgment motion, the moving party represents that there is no evidence of one or more essential elements of a claim for which the non-moving party bears the burden of proof at trial. Tex. R. Civ. P. 166a(i). A no-evidence summary judgment must be granted if the moving party does not respond with competent evidence that raises a genuine issue of fact on the challenged elements. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Watson v. Talia Heights, LLC*, 566 S.W.3d 326, 329 (Tex. App.—Houston [14th Dist.] 2018, no pet.). We take as true all evidence favorable to the non-moving party and indulge every reasonable inference and resolve any doubts in the non-moving party's favor. *King Ranch, Inc.*, 118 S.W.3d at 751; *Watson*, 566 S.W.3d at 329.

### B.    Causation — General

In their summary judgment motion, Appellees agreed that moisture causes mold[4] and premised their no-evidence challenge on the specific moisture-causation

---

[4] Appellees stated as follows:

The parties agree that moisture causes mold and wood floors to buckle and cup. Thus, it is important to determine the source of the moisture. Therefore, the moisture intrusions caused by the disrepair and deferred maintenance were key causes of mold in [the Wus']

theory espoused by Paula Vance, the Wus' expert witness. Specifically, Vance opined that the moisture in the Wus' home was caused by "wet" leveling compound[5] that was not allowed to properly dry prior to the floor installation.

Pointing to the arguments advanced in their motion to exclude,[6] Appellees asserted that Vance's opinions regarding the source of moisture were speculative, unreliable, outside Vance's expertise, and thus inadmissible. Without this evidence, Appellees argued, the Wus could not meet their burden of proof with respect to causation. Responding to this argument, the Wus pointed to evidence from Appellees' internal investigation, the findings from outside entities engaged to investigate the matter, and their flooring expert Rick Jones.

Proximate causation is an element common to the Wus' negligence, gross negligence, breach of contract, and breach of warranty claims. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006) (requiring proof of proximate cause for negligence, gross negligence, and breach of warranty claims); *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 118 (Tex. 2004) (requiring proof of proximate cause for breach of contract claims). Proximate cause consists of two elements: cause-in-fact and foreseeability. *Kelly v. Ford*, 543 S.W.3d 383, 390

---

home and are totally unrelated to the goods or services that [Appellees] provided.

[5] "Leveling compound" refers to the LevelQuik applied by both John and WFA prior to the flooring installation.

[6] On appeal, the Wus assert that Appellees' summary judgment motion does not meet the requirements of Texas Rule of Civil Procedure 166a because it merely referenced the summary judgment grounds provided in another motion, *i.e.*, Appellees' motion to exclude Vance's opinions, testimony, and report. *See* Tex. R. Civ. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefore.").

However, "[t]he grounds for summary judgment 'may be stated concisely, without detail and argument. But they must at least be listed in the motion.'" *Coastal Cement Sand Inc. v. First Interstate Credit All., Inc.*, 956 S.W.2d 562, 565 (Tex. App.—Houston [14th Dist.] 1997, writ denied) (quoting *McConnell*, 858 S.W.2d at 340). Appellees' summary judgment motion met this minimal standard with respect to their challenge to Vance's opinion on causation. We overrule the Wus' issue I.A.

10

(Tex. App.—Houston [14th Dist.] 2018, pet. denied).  Cause-in-fact means that the defendant's act or omission was a substantial factor in bringing about the injury, without which the injury would not have occurred.  *Id.*

DTPA claims require proof of producing cause.  *See Brown v. Tarbert, LLC*, 616 S.W.3d 159, 167 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).  "[T]he producing cause inquiry is conceptually identical to that of cause-in-fact."  *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 223 (Tex. 2010).

Setting aside the admissibility of Vance's report[7] as well as its contents, the record nonetheless contains evidence sufficient to meet the Wus' summary judgment burden.  Viewed in the light most favorable to the Wus, the record contains more than a scintilla of evidence supporting the proximate cause and producing cause elements of their claims.  *King Ranch, Inc.*, 118 S.W.3d at 751; *Watson*, 566 S.W.3d at 329.

### *Inspect Solutions Report*

Inspect Solutions inspected the Wus' home on June 1, 2015, approximately two months after the flooring installation.  In their report, Inspect Solutions concluded as follows:

Site Related Issues:
There were no site related issues present.

---

[7] On appeal, the Wus also challenge the trial court's order granting Appellees' motion to exclude Vance's opinions, testimony, and report.  However, because this evidence is not necessary to our disposition of the summary judgment issues on appeal, we need not consider the Wus' challenge to this evidentiary ruling.  *See* Tex. R. App. P. 47.1; *Zhu*, 426 S.W.3d at 340-41 ("We will reverse an erroneous evidentiary ruling only if it probably caused the rendition of an improper judgment."); *see also, e.g.*, *Wallace v. Playtex Apparel, Inc.*, No. 05-97-00202-CV, 1999 WL 173700, at *4 n.2 (Tex. App.—Dallas Mar. 31, 1999, pet. denied) (concluding the admitted evidence raised an issue of fact sufficient to defeat summary judgment, the court "need not discuss the remainder of appellant's summary judgment evidence nor the propriety of the trial court's decision to exclude it").  We overrule the Wus' issue I.C.

Installation Related Issues:

Failure to properly prepare or acclimate the bamboo flooring will result in continued expansion or contraction of the flooring after the flooring is installed.

Lack of expansion space will result [in] excess stress between planks when planks expand resulting [in] crushed edges and/or loose/buckled flooring.

Failure to properly test concrete slabs prior to installation of Bamboo flooring will result in flooring being installed into a wet environment which produces moisture related issues as in this case.

All of the issues above are either directly responsible or a contributing factor in the issues Mr. Wu is concerned about. They are installation related.

In sum, Inspect Solutions identified three "Installation Related" issues that contributed to the flooring damage: failure to prepare or acclimate the bamboo flooring, lack of expansion space between the planks, and failure to properly test the concrete slabs. The third identified issue — failure to properly test the concrete slabs — was directly tied to "moisture related issues" which, as the parties agree, cause mold.

*MAPEI Report*

Lumber Liquidators also retained glue-manufacturer MAPEI to inspect the incident. In its July 2015 report, MAPEI concluded as follows:

The following are our observations on the information provided:

- The homeowner stated that the flooring was not acclimated and that no moisture testing was done prior to installation.

- No expansion space was present at the walls in all rooms.

- All moisture readings taken by the inspector reported higher than average readings.

- The inspector noted no manufacturing defects.

Based on the analysis of the samples and all the information available

to us, we conclude that the issue reported could not be attributed to a product deficiency.

Possible causes for the conditions experienced for this project can be attributed to one or more, but not limited to, the following:

- Failure to properly test concrete slabs prior to installation of Bamboo flooring will result in flooring being installed into a potentially wet environment which can produce moisture related issues.

- Lack of required expansion space will result [in] excess lateral and tensile stress when planks shrink and swell, resulting in cupped/crowned and or loose/buckled flooring.

- Failure to properly prepare or acclimate the bamboo flooring will result in continued expansion or contraction of the flooring after the flooring is installed, exacerbating the previous point.

In sum, MAPEI also identified three possible installation-related causes: failure to properly test the concrete slabs prior to installation, lack of expansion space, and failure to prepare or acclimate the bamboo flooring. Like Inspect Solutions, MAPEI's conclusion regarding the failure to properly test the concrete slabs was identified as a potential cause of moisture.

### *Rick Jones' Expert Report*

The Wus included with their summary judgment response a report from flooring expert Rick Jones. Jones inspected the home and flooring in May 2017, approximately two years after the installation. Jones observed the "flooring float"[8] applied by the WFA installers was "soft and powdery" and there were "open holes/bubbles through where they had used the float." In contrast, Jones noted that his examination "of the areas where Mr. Wu indicated he applied the float found the float material to be hard not powdery and still attached to the subfloor or in a

---

[8] "Flooring float" refers to the LevelQuik leveling compound applied by both John and WFA prior to the flooring installation.

layer to the bottom of the glue."

Jones concluded that:

- the "bamboo flooring cupped and buckled consistent with excessive moisture from the concrete subfloors";
- the installers did not perform ASTM[9] moisture testing as required per the flooring and adhesive manufacturers;
- the adhesive was not applied as required by the adhesive manufacturer to form a moisture barrier as shown by Jones' observations and photos;
- the flooring started to cup within two weeks of installation, which is "consistent with excessive moisture being present at the time of the installation";
- a soft powdery float is consistent with the float being over-watered;
- thin film, bubble holes, and soft powdery consistency of the float are consistent with the float having been mixed with too much water;
- excessive water in the float may have also contributed to the moisture causing the cupping and buckling; and
- if mixed properly the float will not scratch easily or be soft or powdery.

In conclusion, Jones opined that "the cupped and buckled flooring is caused by the installers provided by Lumber Liquidators." As with the Inspect Solutions and MAPEI reports, Jones directly tied the alleged faulty installation to the presence of moisture.

***Internal Lumber Liquidators Emails***

Finally, Lumber Liquidators included with the summary judgment motion internal emails discussing the issues with the Wus' flooring.

---

[9] ASTM is an acronym for the American Society for Testing and Materials.

In a July 7, 2015 email, Lumber Liquidators customer relations specialist Kerry emailed Lumber Liquidators regional sales manager Dustin Grant inquiring about the status of the investigation into the Wus' flooring issues. Kerry wrote as follows:

> Dustin
>
> What's going on with this one? I know they sent over all the info to Mapei for further review. But the samples we got in from the inspection **show the wrong trowel size and lack of adhesive coverage**. Plus **lack of expansion space**.

(emphasis added). Kerry also sent to Grant the Inspect Solutions report. Responding to Kerry, Grant said: "Looks like the Wu job **was symptomatic of incorrect trowel size**. We need to replace this floor." (emphasis added).

In a separate email chain from September 2015, Kerry emailed Lumber Liquidators coordinator Derrick Roots regarding the issues with the Wus' flooring. Discussing the buckling noted in the flooring, Roots said: "Did we get product sent here? **You know that this product is problematic**." (emphasis added). Kerry responded that they will obtain samples when the floor is pulled up, to which Roots replied, "[w]e have had an issue with this product before."

Taken together, this evidence — at the very least — creates a question of fact regarding whether Appellees' alleged defective installation of the flooring caused the mold in the Wus' home. *See Transcon. Ins. Co*, 330 S.W.3d at 223; *Kelly*, 543 S.W.3d at 390. Both Inspect Solutions and MAPEI found that WFA failed to properly test the concrete slabs prior to the flooring installation and stated that this oversight can lead to moisture-related issues. Similarly, Jones stated in his report that the installers did not perform ASTM moisture testing and that the flooring adhesive was not correctly applied as necessary to form an effective moisture barrier. Jones also opined that excessive water in the leveling compound

15

may have contributed to the elevated moisture levels and noted that the "bamboo flooring cupped and buckled consistent with excessive moisture from the concrete subfloors." Finally, Lumber Liquidators' internal emails also show the company was aware of problems with the product and, on its end, identified other deficiencies in the installation.

For these reasons, Appellees' no-evidence challenge to the common causation element does not provide a sufficient basis to warrant summary judgment on the Wus' claims. We sustain the Wus' issue I.B.

## C. Causation — Personal Injury Claims

In their summary judgment motion, Appellees argued that the Wus' personal injury claims should be dismissed because the Wus "failed to adduce any reliable expert testimony that their claimed personal injuries were caused by mold in the home." The Appellees pointed to the arguments raised in their motion to exclude the testimony, opinions, and report of Dr. Scott McMahon, the Wus' expert on medical causation. Without Dr. McMahon's testimony, Appellees argued, the Wus could not produce any evidence on causation as necessary to maintain their personal injury claims.

The same day it signed its order granting Appellees' summary judgment motion on the Wus' claims, the trial court signed an order granting Appellees' motion to exclude Dr. McMahon's evidence. The Wus challenge both rulings on appeal.

### 1. Expert Testimony, Toxic Torts, and the Applicable Standard of Review

A witness may be qualified to testify as an expert based on his "knowledge, skill, experience, training, or education." Tex. R. Evid. 702. Moreover, expert testimony on "scientific matters . . . naturally must be 'grounded in the methods

16

and procedures of science.'" *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 73 (Tex. 2023) (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995)). An expert's testimony is properly excluded if it is based on unreliable foundational data or if the expert's conclusions drawn from that data are based on flawed methodology. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

The Texas Supreme Court has delineated several non-exclusive factors "helpful to determining the reliability of scientific evidence," including:

1. the extent to which the theory has been or can be tested;
2. the extent to which the technique relies upon the subjective interpretation of the expert;
3. whether the theory has been subjected to peer review or publication;
4. the technique's potential rate of error;
5. whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
6. the non-judicial uses which have been made of the theory or technique.

*E.I. du Pont de Nemours & Co.*, 923 S.W.2d at 557.

A "toxic tort" refers to a cause of action arising out of the exposure to hazardous chemicals, hazardous waste, hazardous hydrocarbons, or similarly harmful organic substances. *See Starr v. A.J. Struss & Co.*, No. 01-14-00702-CV, 2015 WL 4139028, at *7 (Tex. App.—Houston [1st Dist.] July 9, 2015, no pet.) (mem. op.); *see also Toxic Tort*, Black's Law Dictionary (11th ed. 2019). A cause of action relating to mold exposure constitutes a toxic tort. *See Chase v. Packing*, No. 05-16-00620-CV, 2017 WL 2774449, at *1 (Tex. App.—Dallas June 27, 2017, no pet.) (mem. op.); *Starr*, 2015 WL 4139028, at *7; *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 238-39 (Tex. App.—Austin 2002, pet. granted, judgm't vacated

w.r.m.).

Causation in the context of toxic torts often is discussed in terms of general and specific causation. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 545 (Tex. 2011); *Merck & Co. v. Ernst*, 296 S.W.3d 81, 95 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). "General causation involves whether the substance at issue is capable of causing the injury at issue while specific causation involves whether the substance at issue in fact caused the particular injury at issue." *BIC Pen Corp.*, 346 S.W.3d at 545. Expert testimony generally is used to establish these forms of causation. *See Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007) ("The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors."); *Starr*, 2015 WL 4139028, at *6 ("Expert testimony is particularly necessary in toxic-tort and chemical-exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony.").

Our analysis below focuses on the evidence relevant to the specific causation inquiry. "Where direct evidence of specific causation is unavailable, specific causation may be established through an alternative two-step process whereby the plaintiff establishes general causation through reliable studies, and then demonstrates that his circumstances are similar to the subjects of the studies. *Bostic v. Ga.-Pac. Corp.*, 439 S.W.3d 332, 351 (Tex. 2014) (citing *Havner*, 953 S.W.2d at 715). This burden includes proof that (1) the injured person was exposed to the same substance, (2) the exposure or dose levels were comparable to or greater than those in the studies, (3) the exposure occurred before the onset of the injury, and (4) the timing of the onset of injury was consistent with that experienced by those in the study. *Id.*

"In a toxic-tort case alleging human exposure to harmful substances, the

18

'minimal facts necessary to demonstrate specific causation' include '[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities.'" *Helena Chem. Co.*, 664 S.W.3d at 76 (quoting *Builders Servs. Grp., Inc. v. Taylor*, No. 03-18-00710-CV, 2020 WL 5608484, at *6 (Tex. App.—Austin Sept. 17, 2020, pet. denied) (mem. op.)). If other plausible causes of the injury exist, the plaintiff also must offer evidence excluding those causes with reasonable certainty. *Havner*, 953 S.W.2d at 720.

We review the trial court's decision to admit or exclude expert witness testimony for an abuse of discretion. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam); *Fleming v. Kinney ex rel. Shelton*, 395 S.W.3d 917, 926 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *K-Mart Corp.*, 24 S.W.3d at 360.

### 2. *Relevant Evidence and Application*

In his affidavit accompanying the Wus' response to Appellees' motion to exclude, Dr. McMahon described chronic inflammatory response syndrome ("CIRS") as "a multi-symptom, multi-system illness caused by innate immune system dysregulation resulting from exposure to toxins and inflammagens typically found in water damaged buildings." According to Dr. McMahon, CIRS can manifest itself with a variety of symptoms, including "fatigue, headaches, sleep problems, etc., cognitive deficits, neurological damage, gastrointestinal, dermatologic, muscoskeletal, ophthalmic and other system injury." Continuing on, Dr. McMahon stated that "patients with CIRS can have problems in virtually any system of the body."

Dr. McMahon prepared a one-page report for each of the Wus in which he diagnosed them with CIRS and described the ailments stemming from their

diagnoses.  We summarize the specific contents of Dr. McMahon's expert reports as follows:

John

- John has "become progressively more ill" since living in a water-damaged building (*i.e.*, his home post-flooring installation).

- John first visited Dr. McMahon in November 2015, complaining of chronic fatigue, muscle weakness, muscle pain, debilitating headaches, light sensitivity, congestion, cough, shortness of breath, abdominal pains, joint pain, cognitive impairment, night sweats, mood swings, appetite swings, and tremors.

- John came for a follow-up appointment two months later.  Dr. McMahon noted improvement in John's symptoms but "only a 50% improvement in cognitive abilities."

- John "has suffered physical and cognitive damage as a result of CIRS and is currently 100% disabled."

Yangjing Zhou, John's wife

- Yangjing first visited Dr. McMahon in November 2015.

- Yangjing "had an environmental history, through her residence, that was consistent with exposure to mold."

- Yangjing was diagnosed with CIRS.

- On follow-up visits, Yangjing "demonstrated considerable improvement in most body symptoms" but "continues to suffer significant fatigue, neck pain, and some decrease of cognitive abilities."  Yangjing "has recently been found to have a mildly elevated anti-TPO antibody which could mean the beginning of Hashimoto's thyroiditis."

K.W., John and Yangjing's 11-year-old daughter

- K.W. first visited Dr. McMahon in November 2015.

- K.W. "had an environmental history, through her residence, that was consistent with exposure to mold."

- K.W. was diagnosed with CIRS.

20

- On follow-up visits, K.W. "demonstrated considerable improvement in most body symptoms" but "continues to suffer significant respiratory symptoms (including new bronchospasm, recently diagnosed as asthma), headaches, abdominal issues, cognitive deficits, frequent urination and more." K.W. also demonstrates nasal congestion, hearing loss, and swelling in her brain "consistent with structural brain damage" caused by CIRS.

E.W., John and Yangjing's 7-year-old son

- E.W. first visited Dr. McMahon in November 2015.

- E.W. "had an environmental history, through his residence, that was consistent with exposure to mold."

- E.W. was diagnosed with CIRS.

- On follow-up visits, E.W. "demonstrated considerable improvement in most body symptoms" but "continues to suffer significant upper respiratory symptoms, less frequent abdominal issues, some decrease of endurance compared to peers, frequent nighttime urination, and more."

Three of Dr. McMahon's four reports conclude with the following statement:

> I am certified and specialize in the diagnosis and treatment of CIRS. I have published, have spoken widely and have testified as an expert witness about CIRS in several states. [Appellant] meets all published diagnosis criteria for CIRS-WDB and meets the GAO 2008 criteria describing causation.

Appellees included with their motion to exclude excerpts from Dr. McMahon's deposition. In relevant part, Dr. McMahon testified as follows:

Q. Well, let's talk about CIRS. Is there a minimum dose required in order to develop CIRS if you're one of the people who are susceptible to it?

A. You know, to date, there's never been found a safe level of mold in any part of the literature. So the understanding from the CDC and from FEMA and from other governmental agencies is if you can see visible mold or you can smell it, that it needs to be remediated. You don't even have to do

commercial testing to see how much there is.  It needs to be remediated.

Q.  Right.  But I'm not talking about a public health response, which is meant to be protected to health [sic].  I'm talking specifically about a dose response relationship that leads to a specific health end point.  Do you understand that?

A.  I do.  And I don't know that any testing on that has been done.  What I know is that if it's a water-damaged building, and patients who have CIRS enter a water-damaged building, they have exacerbation of their symptoms.

Q.  Right.  And I'm not talking about what you just said, which is somebody, I guess, who has been confirmed to have CIRS.  I'm talking about someone who may or may not be susceptible, or I guess would be genetically susceptible to have CIRS.  *What is the minimum dose required for that person who is susceptible to develop CIRS from a water-damaged building*?

A.  Again, *it only takes one fragment*.  *And for every spore that you find, studies show that there's, you know up to 550 fragments in the air*.  So it only takes one fragment to trigger the innate immune system.  This is a . . . dysregulation of the innate immune system.  So conceivably, *I could say a single fragment*.

                    *              *              *

Q.  As you sit here today, there's no retrospective epidemiology that you're aware of that says that there's a dose response relationship between CIRS to a water-damaged building and a person who is genetically susceptible to CIRS?

A.  I know that there's a dose response that is in the standard immunologic literature that says that *you will have a response, an innate immune response, to even a single fragment of a foreign body in your body*.  And I know that CIRS is an illness of dysregulation of that.  So from that point of view, you can extend that and say that *any exposure to water-damaged buildings potentially can trigger CIRS in*

22

*somebody who is predisposed*.

        \*                \*                \*

Q. Do you agree that even if mold is growing actively, it may not be releasing spores continuously?

A. That's possible.

        \*                \*                \*

Q. So it's your opinion that exposure to indoor mold will cause an adverse health reaction?

A. That it can cause an adverse health reaction in some people.

Q. Okay. And that depends on genetic susceptibility of that person?

A. Genetic susceptibility. I mean, again, we talked earlier there are a number of different mold-based adverse health effects, and anybody can go into a moldy enough building and start having a sore throat and runny nose and the like.

        \*                \*                \*

Q. *But we also established earlier that in the outdoor environment, people are exposed to mold and other sorts of micro-organisms every single day, right*?

A. *Yes*.

Q. *And that exposure is not always enough to trigger the dysregulation that comes from CIRS, right*?

A. *Correct*.

Q. So there has to be some level at which a person can be exposed to mold without having a CIRS reaction, right?

A. Many different factors. It's not really a "yes" or "no" question, or I can't give a "yes" or "no" answer to that. Many different factors involved.

        \*                \*                \*

Q.    Do you agree that not all water-damaged buildings are the same in terms of what they present to the occupant, meaning that the type of mold, the type of bacteria can vary in terms of what is present in each specific water-damaged building?

A.    Yes.

Q.    And that the composition and the proportions in which those different substances are present can vary between water-damaged building and water-damaged building?

A.    Yes.

Q.    But it's your opinion that the difference is insignificant?

A.    Because all the fragments, whether they come from molds or bacteria or actinomycetes or micro bacteria are immunogenic, so that makes it insignificant.  There may be more amount in one than the other, but the actual species are not as important unless you're looking specifically at toxins.

                    *                    *                    *

Q.    Well, we talked earlier about the fact that just because mold is present does not mean that it's actually sporulating, right?

A.    That's correct.

Q.    And we also talked earlier that just because mold is present, it doesn't mean it's producing a mycotoxin, right?

A.    That's correct.

(emphases added).

Taken together, the evidence before the trial court provided a basis sufficient for the court to exercise its discretion in granting Appellees' motion to exclude Dr. McMahon's testimony, opinion, and report.  The evidence failed to make the showing necessary with respect to specific causation.  *See Bostic*, 439 S.W.3d at 351; *Havner*, 953 S.W.2d at 715.

24

The evidence pertinent to Dr. McMahon's opinions did not establish the specific exposure or dosage levels applicable to the Wus nor did it show that these exposure levels were comparable to those experienced by subjects in other studies that exhibited similar symptoms. Rather, as Dr. McMahon repeatedly explained at his deposition, a "single fragment" is sufficient to trigger a dysregulation of the innate immune system. But Dr. McMahon also acknowledged that people generally are exposed to mold and other toxins in their environments "every single day"; however, that exposure alone is not always sufficient to trigger an onset of CIRS. By failing to tie the Wus' onset of CIRS to a specific mold-exposure level, Dr. McMahon failed to demonstrate "scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities." *Helena Chem. Co.*, 664 S.W.3d at 76; *see also, e.g.*, *Builder Servs. Grp., Inc.*, 2020 WL 5608484, at *6 (concluding an expert's opinion was unreliable because he "unequivocally stated that he did not know what level of isocyanate exposure was experienced by any of the [plaintiffs] and, in fact, testified that he did not need to know because any level of exposure to isocyanate can cause the symptoms"); *Frias v. Atl. Richfield Co.*, 104 S.W.3d 925, 930 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (concluding that the expert's testimony on specific causation was legally insufficient, we noted that "such indefinite terms as 'consistently,' 'regular,' and 'occasional' leave the frequency . . . and duration . . . of exposure, at any single exposure level and in total, subject to wide variance and thus largely open to speculation"); *Austin v. Kerr-McGee Refin. Corp.*, 25 S.W.3d 280, 292 (Tex. App.—Texarkana 2000, no pet.) (the plaintiffs "did not offer scientifically reliable evidence of specific causation, *i.e.*, that [the plaintiff] was exposed to benzene at all, or if he was, to what degree or level").

Moreover, the evidence pertinent to Dr. McMahon's opinions did not state

25

what kind of mold or other toxins were present in the Wus' home and how the exposure to those specific toxins caused the Wus' symptoms. Dr. McMahon acknowledged that water-damaged buildings are different and can produce different molds or types of bacteria, and that some molds do not "sporulat[e]" or produce a mycotoxin. But Dr. McMahon did not identify the specific mold or toxin relevant to the facts here. *See, e.g.*, *Gaudette v. Conn Appliances, Inc.*, No. 09-06-444 CV, 2007 WL 2493437, at *8 (Tex. App.—Beaumont Sept. 7, 2007, no pet.) (mem. op.) (concluding the expert's report did not make a specific causation showing, the court noted that the "report fails to show that appellants were actually exposed to any mycotoxins in their house, what specific molds they may have been exposed to inside the house, and the levels of mold in the house").

Finally, Dr. McMahon did not rule out other plausible causes of mold in the Wus' home that also could have contributed to the Wus' symptoms. *See Havner*, 953 S.W.2d at 720. Appellees included with their summary judgment motion an insurance claims history report on the Wus' home, which shows a claim was initiated on April 19, 2015 — around the same time Appellees installed the bamboo flooring. The claim sought compensation for hail and wind damage to the home's roof and noted "water damage" to the ceiling drywall in two bedrooms, the laundry room, the hall bathroom, and the dining room.

According to Dr. McMahon's testimony, any building becomes "water-damaged" after "24 to 48 hours of water coming in contact with cellulose-containing building materials." As we quoted above, Dr. McMahon also stated that "any exposure to water-damaged buildings potentially can trigger CIRS in somebody who is predisposed." But, although the record shows two separate events that led to the Wus' home becoming a "water damaged building," Dr. McMahon did not tie the Wus' symptoms to one specific incident as necessary to

26

make a specific causation showing. *See id.*; *see Mo. Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 758 (Tex. App.—San Antonio 2002, no pet.) (noting that diabetes is a "risk factor for multiple myeloma," the court held that the plaintiff's experts failed to rule out diabetes as a causation factor for the plaintiff's myeloma).

For these reasons, we conclude the evidence pertinent to Dr. McMahon's proffered opinion failed to make the showing necessary with respect to specific causation. *See Bostic*, 439 S.W.3d at 351; *Havner*, 953 S.W.2d at 715. Therefore, the trial court did not abuse its discretion in granting Appellees' motion to exclude Dr. McMahon's testimony, opinions, and report. *See K-Mart Corp.*, 24 S.W.3d at 360.

The Wus did not present any other evidence to support the specific causation element of their personal injury claims. Accordingly, the trial court did not err in rendering summary judgment on these causes of action. *See* Tex. R. Civ. P. 166a(i). We overrule the Wus' second issue.

## D. DTPA Claims

The Wus assert the trial court erred in granting Appellees' no-evidence summary judgment on their DTPA claims because they produced sufficient evidence to support each of the challenged elements. We disagree.

"The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see* Tex. Bus. & Com. Code Ann. § 17.50(a). The elements of a DTPA claim are: (1) the plaintiff was a consumer; (2) the defendant either engaged in false, misleading, or deceptive acts (*i.e.*, violated a specific laundry-list provision of the DTPA) or engaged in an unconscionable action or course of action; and (3) the DTPA laundry-list violation or unconscionable action was a

producing cause of the plaintiff's injury. *Amstadt*, 919 S.W.2d at 649; *see also Mays v. Pierce*, 203 S.W.3d 564, 571-72 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

In their amended petition, the Wus allege that Appellees committed the following false, misleading, or deceptive acts:

(1)     passing off goods and services as those of another;

(2)     causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(3)     representing that goods and services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

(4)     representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(5)     representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

(6)     failing to disclose information concerning goods or services which was known at the time of the transaction with the intention to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

*See* Tex. Bus. & Com. Code Ann. § 17.46(b)(1), (3), (5), (7), (12), (24). The Wus also allege that Appellees engaged in an unconscionable action or course of action.[10] *See id.* § 17.45(5).

---

[10] The Wus also allege that Appellees breached the DTPA by "breaching express and implied warranties." However, the DTPA does not create warranties — instead, warranties must be established independently of the act. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 666 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Appellees did not raise a no-evidence challenge to the Wus' DTPA warranty claims but,

In their no-evidence summary judgment motion, Appellees asserted that the Wus could not produce any evidence to support either the alleged laundry-list violations or the unconscionable course of action allegations. We consider these arguments separately. *See Mays*, 203 S.W.3d at 571-72 (noting that a laundry-list violation and an unconscionable course of action allegation are "distinct and [that] either basis will support recovery").

### 1. Laundry-List Violations

In their summary judgment response, the Wus pointed to evidence supporting the following allegations:

- Appellees represented they would exercise care and prudence in installing the floors but they "had no intention" or were "incapable" of performing their services in this manner.

- Appellees did not adhere to the "basic tenets" for floor installation, which include taking moisture readings, properly applying the adhesive, and implementing the required expansion spaces between planks.

- After they received the Inspect Solutions report, Appellees did not report to John that the floor installation caused "elevated moisture levels" or a "risk of mold."

Of the six laundry-list violations pleaded in the Wus' amended petition, these allegations support two: "representing that [] services are of a particular standard, quality, or grade . . . if they are of another," and "failing to disclose information" known at the time of the transaction with the intent of inducing the customer into a transaction the customer otherwise would not have entered. *See* Tex. Bus. & Com. Code Ann. § 17.46(b)(7), (24).

rather, raised traditional grounds they argued warranted judgment as a matter of law on these causes of action. We examine these arguments below in our consideration of Appellees' traditional summary judgment grounds.

We begin with the DTPA violation alleging a misrepresentation of services. *See id*. § 17.46(b)(7). Determining whether the alleged facts "rise[] to the level of a misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry." *Mays*, 203 S.W.3d at 574. Whether the facts constitute a DTPA misrepresentation is a question of law. *Id*.

However, when a party cannot show harm from reliance but only harm from the failure to perform, the party's action lies in contract rather than under the DTPA. *See, e.g.*, *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14-15 (Tex. 1996) (per curiam) (no violation of the DTPA when the statements of the defendant's representative did not cause harm but, instead, the failure to run the advertisement harmed the plaintiff); *Dewayne Rogers Logging, Inc. v. Propac Indus., Ltd.*, 299 S.W.3d 374, 387 (Tex. App.—Tyler 2009, pet. denied) ("When a representation by a defendant causes no harm itself, but instead the injury or damage was caused by the breach of contract, that injury is governed by contract law, not the DTPA."); *Mays*, 203 S.W.3d at 574 ("[The plaintiff] did not show she was harmed by [the defendant's] representations, but only showed harm caused by [the defendant's] failure to perform."); *Richardson v. Duperier*, No. 14-04-00388-CV, 2005 WL 831745, at *4-5 (Tex. App.—Houston [14th Dist.] Apr. 12, 2005, no pet.) (mem. op.) (no DTPA claim when the plaintiff's allegations were premised on the defendant's "alleged failure to perform the contract").

The Wus allege that Appellees misrepresented they would exercise care or prudence in installing the floors but did not adhere to the "basic tenets" for floor installation. These allegations do not show the Wus were harmed by Appellees' representations but, rather, by Appellees' alleged failure to perform the parties' contract. Because these allegations do not rise beyond a breach of contract claim, they are not actionable under the DTPA. *See Crawford*, 917 S.W.2d at 14-15;

30

*Mays*, 203 S.W.3d at 574; *Richardson*, 2005 WL 831745, at \*4-5.

We turn to the DTPA violation premised on Appellees' alleged failure to disclose that the floor installation caused "elevated moisture levels" or a "risk of mold." To prevail on a claim for failure to disclose, the plaintiff must prove four elements: (1) a failure to disclose information concerning goods or services; (2) that was known at the time of the transaction; (3) such failure was intended to induce the consumer into a transaction; and (4) that the consumer would not have entered into the transaction had the information been disclosed. *See* Tex. Bus. & Com. Code Ann. § 17.46 (b)(24); *Red Roof Inns, Inc. v. Jolly*, No. 14-10-00344-CV, 2011 WL 6288147, at \*7 (Tex. App.—Houston [14th Dist.] Dec. 15, 2011, no pet.). In essence, these elements require the plaintiff to show that certain information was not disclosed at the time of the transaction with the intent to induce the plaintiff to enter into the transaction. *See* Tex. Bus. & Com. Code Ann. § 17.46 (b)(24).

Here, the Wus did not produce any evidence showing Appellees knew, at the time the parties entered the contract, that the floor installation would cause "elevated moisture levels" or a "risk of mold." Accordingly, these allegations will not support a DTPA claim for failure to disclose. *See id.*; *see also, e.g.*, *Keathley v. Baker*, No. 12-07-00477-CV, 2009 WL 1871706, at \*7 (Tex. App.—Tyler June 30, 2009, no pet.) (mem. op.) (evidence did not support a DTPA failure to disclose claim where the "information was not discovered until after the [plaintiffs] agreed to purchase [the] house and entered into the contract").

The Wus did not provide any argument or evidence to support their other pleaded DTPA laundry-list claims. *See* Tex. Bus. & Com. Code Ann. § 17.46(b)(1), (3), (5), (12). Therefore, the trial court did not err in granting summary judgment on the Wus' laundry-list DTPA claims.

## 2.     *Unconscionable Action or Course of Action*

The Wus relied on the same allegations listed above to support their unconscionable action DTPA claim.

The DTPA defines "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id*. § 17.45(5).   Unconscionability under the DTPA is an objective standard for which scienter is irrelevant. *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001).

"Taking advantage of a consumer's lack of knowledge to a grossly unfair degree . . . requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex. 1985).   Although there is no requirement that the defendant's unconscionable act occur simultaneously with the transaction that forms the basis of the consumer's complaint, an action or course of action is unconscionable only if it "reflect[s] on the unfairness of the original transaction." *See id*.; *see also, e.g.*, *McNeely v. Salado Crossing Holding, L.P.*, No. 04-16-00678-CV, 2017 WL 2561551, at *5-6 (Tex. App.—San Antonio June 14, 2017, no pet.) (mem. op.) (because plaintiffs leased their apartment two years before the alleged unconscionable actions occurred, their complaints "do not reflect on the unfairness of the original transactions of leasing the apartment or renewing the lease").

Here, the Wus did not make the showing necessary to maintain their unconscionable action DTPA claim.   Although the chain of events forming the basis of the Wus' claims is frustrating, it does not rise to the level of unfairness that can be described as "glaringly noticeable, flagrant, complete, and unmitigated." *Compare Tyre v. Yawn*, No. 01-08-00914-CV, 2011 WL 662957, at *6 (Tex.

32

App.—Houston [1st Dist.] Feb. 17, 2011, no pet.) (mem. op.) (evidence supported finding unconscionable action when the defendant misrepresented that the machine would be delivered knowing (1) that it would not be, and (2) that the plaintiff would be unable to maintain its business without it) *and Gilbert v. Gen. Motors Corp.*, No. 2-05-243-CV, 2006 WL 1714040, at \*5 (Tex. App.—Fort Worth June 22, 2006, no pet.) (mem. op.) (evidence raised a fact issue on unconscionable action when the defendants "misstated the reasons [the plaintiff's] vehicle was brought in for service, ignored mechanical defects, and told him that nothing was found wrong with the vehicle") *with Pourmemar v. Chase Home Fin., L.L.C.*, No. 01-10-00474-CV, 2011 WL 5026189, at \*2-3 (Tex. App.—Houston [1st Dist.] Oct. 20, 2011, no pet.) (mem. op.) (no evidence of an unconscionable action when the plaintiff merely alleged that Chase "failed to timely correct their error"). Moreover, the Wus do not cite any case law or other authority to support concluding otherwise. *See* Tex. R. App. P. 38.1.

In sum, we conclude the trial court did not err in granting Appellees' no-evidence summary judgment motion on the Wus' DTPA claims premised on the alleged laundry-list violations and an unconscionable course of action. We overrule in part the Wus' issue I.D. with respect to their DTPA claims.

### E.    Gross Negligence Claims

In their no-evidence summary judgment motion, Appellees asserted that the Wus could not adduce any evidence to support their gross negligence claim. We agree.

A gross negligence claim requires proof of each of the elements of a simple negligence claim and a showing of two additional elements:

(1)    viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of

33

> risk, considering the probability and magnitude of the potential harm to others; and

(2)     the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.

*Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (per curiam). Under the objective prong, "extreme risk" is not "a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). This element, also known as the "entire want of care" test, distinguishes ordinary negligence from gross negligence because the act involves a higher "degree or quantity" of negligence. *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325 (Tex. 1993).

In contrast, the subjective component focuses on the actor's state of mind, examining whether the actor knew about the peril caused by the actor's conduct but acted in a way that demonstrates the actor did not care about the consequences to others. *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012). "An act or omission that is merely ineffective, thoughtless, careless, or not inordinately risky is not grossly negligent." *Id*. at 797. Only if the actor's conduct is unjustifiable and likely to cause serious harm can it be grossly negligent. *Id*.

Responding to Appellees' no-evidence summary judgment motion, the Wus pointed to evidence showing that Appellees were (1) "very much aware that moisture problems could occur from improperly installing floors," and (2) "very much aware that high moisture levels could result in mold contamination." But these allegations and their supporting evidence do not rise to the level necessary to satisfy the objective component of the Wus' gross negligence claims.

Compared with Texas jurisprudence, neither "moisture problems" nor "mold contamination" stemming from a residential floor installation are the type of

"extreme risk" that presents a likelihood of serious injury as necessary to recover for gross negligence. *See, e.g.*, *McDaniel v. Dindy*, 673 S.W.3d 24, 35-37 (Tex. App.—Fort Worth 2023, no pet.) (the defendant was transporting a dolly that fell from his vehicle's trailer and struck another vehicle; objective test satisfied when evidence showed that not securing the dolly to a moving vehicle presented an extreme risk of harm); *Press Energy Servs., LLC v. Ruiz*, 650 S.W.3d 23, 46-47 (Tex. App.—El Paso 2021, no pet.) ("Evidence of intentional manipulation of a truck's braking system amounts to more than mere thoughtlessness, carelessness, or ordinary risk."); *Martinez v. Kwas*, 606 S.W.3d 446, 464-65 (Tex. App.— Houston [1st Dist.] 2020, pet. denied) ("failure to adequately train, supervise, and equip" dump truck drivers satisfied objective test); *Goodyear Tire & Rubber Co. v. Rogers*, 538 S.W.3d 637, 645-46 (Tex. App.—Dallas 2017, pet. denied) (objective test met when the evidence showed the defendant "turned a blind eye to the dangers of asbestos in its Tyler facility for at least eleven years"). Nor do the Wus cite any case law or other authority to support concluding otherwise.

We conclude the Wus did not meet their evidentiary burden in response to Appellees' no-evidence summary judgment motion with respect to their gross negligence claims. We overrule in part the Wus' issue I.D. with respect to their gross negligence claims.

## III.  Appellees' Traditional Summary Judgment Grounds

Appellees raised three traditional summary judgment arguments in their combined motion:

1.  the Wus' implied warranty claims should be dismissed because the Wus waived all implied warranties;

2.  the Wus' express warranty claims should be dismissed because Appellees honored the express warranty; and

3.  the Wus' claims for property and economic damages should be

35

dismissed because the Wus agreed to limit such damages in the Home Improvement Agreement.

We consider these issues individually.

## A.    Standard of Review

The movant for traditional summary judgment must establish that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 607 (Tex. 2013).  A defendant moving for summary judgment must either (1) disprove at least one essential element of the challenged claim, or (2) conclusively establish all elements of an affirmative defense.  *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1997) (per curiam).

In deciding whether there is a disputed material fact precluding summary judgment, evidence favorable to the non-movant must be taken as true, every reasonable inference indulged in the non-movant's favor, and any doubts resolved in its favor.  *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence.  *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

## B.    Implied Warranty Claims

### 1.    *Implied Warranties of Merchantability and Fitness for a Particular Purpose*

In their summary judgment motion, Appellees argued that the Wus waived their claims for breach of the implied warranties of merchantability and fitness for a particular purpose.  Appellees supported this argument with reference to (1) the March 29, 2015 Invoice from Lumber Liquidators to John for the installation services, and (2) the Home Improvement Agreement from Lumber Liquidators to

36

John.  In relevant part, the Invoice states as follows:

> **Limited Warranty and Other Limitations:**  Products may or may not have a limited warranty as specified in information with the product or available as set forth below.  ALL OTHER WARRANTIES ARE DISCLAIMED EXCEPT TO THE EXTENT THAT SUCH WARRANTIES CANNOT BE VALIDLY DISCLAIMED UNDER APPLICABLE LAW.  Lumber Liquidators may, in its discretion, fully and completely resolve a claim for a manufacturer's defect by providing a store credit.  Except to the extent specifically prohibited by law, Lumber Liquidators shall not be responsible or liable, and Buyer waives any claim, for indirect, incidental or consequential damages arising from or relating to Lumber Liquidators' sale of any products.  Under no circumstances shall any liability of Lumber Liquidators arising out of or relating to this transaction exceed the total cost of the products included in this invoice and paid for by Buyer.

(emphasis in original).  The Home Improvement Agreement states, in relevant part:

> **LIMITED WARRANTY**: TO THE EXTENT PERMISSIBLE UNDER APPLICABLE LAW, LUMBER LIQUIDATORS WARRANTS THE WORKMANSHIP OF THE INSTALLATION SERVICES FOR ONE (1) YEAR FROM COMPLETION SUBJECT TO THE TERMS AND CONDITIONS OF THE INSTALLATION WARRANTY (A COPY OF WHICH IS PROVIDED).  LUMBER LIQUIDATORS RESERVES THE RIGHT, IN ITS DISCRETION, TO FULLY SATISFY A WARRANTY CLAIM BY MAKING REPAIRS.  THIS LIMITED WARRANTY GIVES CUSTOMER SPECIFIC LEGAL RIGHTS AND CUSTOMER MAY ALSO HAVE OTHER RIGHTS THAT MAY VARY FROM STATE TO STATE. ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE DISCLAIMED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, EXCEPT TO THE EXTENT THAT ANY SUCH WARRANTIES CANNOT BE VALIDLY DISCLAIMED UNDER APPLICABLE LAW.

(emphasis in original).  Responding to this argument, the Wus asserted that the waivers were ineffective because they were not signed by John.

The implied warranties of merchantability and fitness for a particular purpose are described by the Business and Commerce Code. *See* Tex. Bus. & Com. Code Ann. §§ 2.314, 2.315. The Code also prescribes how these warranties may be waived. *See id*. § 2.316(b). With respect to the implied warranty of merchantability, the waiver "must mention merchantability and in case of a writing must be conspicuous." *Id*. To waive the implied warranty of fitness for a particular purpose, the waiver "must be by a writing and conspicuous." *Id*.

However, as our sister court in *Womco, Inc. v. Navistar International Corp.* explained, an effective waiver of implied warranties examines more than just the language used. *See* 84 S.W.3d 272, 278-80 (Tex. App.—Tyler 2002, no pet.). There, the court concluded that, to be effective, a disclaimer of an implied warranty must be communicated **before** the contract of sale has been completed. *See id*. at 280. In support of this conclusion, the court reasoned:

> One of the underlying purposes of Texas Business and Commerce Code section 2.316 is to protect a buyer from surprise by permitting the exclusion of implied warranties. We fail to see how section 2.316 can fulfill such a purpose unless a disclaimer is required to be communicated to the buyer before the contract of sale has been completed, unless the buyer afterward agrees to the disclaimer as a modification of the contract.

*Id*. at 279-80.

We find this reasoning persuasive and adopt it here. Because the evidence does not conclusively show that the waivers in either the Invoice or the Home Improvement Agreement were communicated to John before the installation sale was completed, Appellees failed to show that they are entitled to summary judgment as a matter of law on these claims. *See id*.

First, the content of the Invoice suggests it was not issued until **after** the sale of installation services was complete. The Invoice lists the total price for the

installation services ($2,990.25), the Wus' down payment on the purchase ($2,000), and the remaining balance ($990.25). Moreover, at his deposition, John testified that he received the Invoice "when [he] purchased" the product. This evidence, viewed in the light most favorable to the Wus, does not conclusively show that the Wus received notice of the waiver in the Invoice before the sale was completed. *See id*.

Second, John was asked at his deposition when he received the Home Improvement Agreement. John testified that he did not receive the Agreement when he purchased the bamboo flooring or the installation but, instead, only received it after "the mold case" broke out. Viewed in the light most favorable to the Wus, this evidence does not conclusively establish Appellees' entitlement to summary judgment on the Wus' implied warranty claims. *See id*.

Therefore, we conclude the trial court erred when it rendered Appellees' traditional summary judgment motion on the Wus' claims for breach of the implied warranties of merchantability and fitness for a particular purpose.

### 2. Implied Warranty to Perform the Services in a Good and Workmanlike Manner

On appeal, the Wus assert the trial court erred in rendering summary judgment on their claim for breach of the implied warranty to perform the services in a good and workmanlike manner. We agree.

The Wus pleaded this claim in their amended petition and, as the Texas Supreme Court explained, this warranty is distinct from the implied warranties of merchantability and fitness for a particular purpose. *See Nghiem v. Sajib*, 567 S.W.3d 718, 724 n.33 (Tex. 2019). Appellees did not address this claim in their combined motion for summary judgment. Therefore, the trial court erred in rendering summary judgment on the Wus' claim for breach of the implied

39

warranty to perform services in a good and workmanlike manner. *See Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam) ("A trial court cannot grant summary judgment on grounds that were not presented.").

We sustain in part the Wus' issue I.D.

## C.    Express Warranty Claims

In their summary judgment motion, Appellees asserted that the Wus' breach of express warranty claim should be dismissed because Lumber Liquidators "honored the express warranty and offered to not only repair the floor, but also to provide a wholly new floor to be installed free of charge." As with their implied-warranty challenges, Appellees supported this argument with reference to the warranty provisions in the Invoice and Home Improvement Agreement quoted above.

An express warranty is created when "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods [] becomes part of the basis of the bargain." Tex. Bus. & Com. Code Ann. § 2.313(a)(1); *see also Young v. Leach*, No. 14-03-00071-CV, 2004 WL 1925967, at *3 (Tex. App.—Houston [14th Dist.] Aug. 31, 2004, pet. denied) (mem. op.). As discussed above, there is no evidence showing the Home Improvement Agreement was given to the Wus before the inception of the mold issue. Therefore, Appellees' alleged satisfaction of this warranty's requirements does not warrant judgment as a matter of law on the Wus' express warranty claim.

We turn now to the warranty provision in the Invoice, which states as follows with respect to satisfaction:

> Lumber Liquidators may, in its discretion, fully and completely resolve a claim for a manufacturer's defect by providing a store credit. . . . Under no circumstances shall any liability of Lumber Liquidators

arising out of or relating to this transaction exceed the total cost of the products included in this invoice and paid for by Buyer.

The summary judgment evidence does not establish this warranty's satisfaction as a matter of law.

In their summary judgment motion, Appellees pointed to two email strings to show compliance with the express warranty provision's limited remedy. These emails indicate that John was informed Lumber Liquidators would replace the bamboo flooring in his home. John's subsequent September 23, 2015 email to a Lumber Liquidators representative states that, two days before, the installers began removing the flooring but found mold underneath.

On September 25, 2015, a WFA representative sent an email to Lumber Liquidators describing a walkthrough at the Wus' home. The email states that a crack was observed in the Wus' foundation slab and John told the installers he "levelled the subfloor himself and used about 80 bags of leveling compound." Continuing on, the email states John was informed that the foundation crack would have to be addressed prior to the new flooring installation.

In an October 28, 2015 email, a WFA representative emailed Lumber Liquidators "to see if Mr. Wu fixed his foundation problems so we can complete his repair." In response, a Lumber Liquidators representative replied: "I never heard back from [John] on the last email I sent him. I have emailed again to try and get further information for you."

Although these emails show Appellees took some steps to try to remedy the issue at the Wus' home, they do not show as a matter of law that the express warranty's remedy provision was satisfied. Therefore, this argument does not warrant summary judgment on the Wus' express warranty claims. We sustain in part the Wus' issue I.D.

## D. Damage Limitations

In their summary judgment motion, Appellees asserted that the Wus' damages in this matter were limited by certain provisions in the Home Improvement Agreement. However, as discussed above, there is no evidence showing that the Home Improvement Agreement was given to the Wus before the purchase was completed or the inception of the mold issue. Therefore, it cannot serve as a damages limitation as a matter of law. *See* Tex. Bus. & Com. Code Ann. § 2.313(a)(1); *see also Young*, 2004 WL 1925967, at *3.

Accordingly, this argument does not warrant summary judgment with respect to the Wus' claimed damages. We sustain in part the remainder of the Wus' issue I.D.

## CONCLUSION

For the reasons described above, we affirm in part the trial court's summary judgment with respect to the Wus' claims for (1) personal injury, (2) DTPA violations premised on a false, misleading, or deceptive act, (3) DTPA violations premised on an unconscionable action or course of action, and (4) gross negligence. We reverse in part the trial court's summary judgment with respect to the Wus' claims for (1) negligence, (2) breach of contract, (3) breach of express warranty, and (4) breach of implied warranty. We remand the case to the trial court for further proceedings limited to the Wus' claims for (1) negligence, (2) breach of contract, (3) breach of express warranty, and (4) breach of implied warranty.

/s/     Meagan Hassan
        Justice


Panel consists of Justices Wise, Spain, and Hassan (Wise, J., dissenting)